

Signed July 26, 2012.

_____
Ronald B. King
United States Chief Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TXCO RESOURCES, INC., | § | CASE NO. 09-51807-RBK |
| ET AL., | § | |
| | § | JOINTLY ADMINISTERED |
| | § | |
| DEBTORS | § | CHAPTER 11 |
| | § | |
| TXCO RESOURCES, INC. | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-5125-RBK |
| | § | |
| PEREGRINE PETROLEUM, L.L.C. | § | |

### OPINION

TXCO Resources, Inc. ("TXCO" or "Debtor") was a publicly traded oil and gas exploration and production company based in San Antonio, which, along with its subsidiaries, filed a voluntary Chapter 11 case on May 17, 2009. Prior to confirmation, the Debtor agreed to

sell most of its oil and gas assets to Newfield Exploration Company ("Newfield") and Anadarko E&P Company L.P. ("Anadarko"). The sale was included in the Debtor's Second Amended Plan of Reorganization (the "Plan"). On January 27, 2010, this Court entered an order (the "Confirmation Order") confirming the Plan. On February 11, 2010, the Plan became effective and Reorganized TXCO ("RTXCO") emerged from Chapter 11. All creditors were paid in full, including interest and attorney's fees, and equity holders received a distribution. The remaining oil and gas assets that were not transferred to Newfield or Anadarko were transferred to the TXCO Liquidating Trust. Newfield is the only shareholder of record in RTXCO and the sole beneficiary of the Liquidating Trust.

On November 23, 2009, prior to confirmation, the Debtor brought this adversary proceeding against Peregrine Petroleum, L.L.C. ("Peregrine") alleging causes of action for misappropriation of trade secrets, violation of the Texas Theft Liability Act, unfair competition by misappropriation, breach of contract, tortious interference with prospective business relations, and for the imposition of a constructive trust to prevent unjust enrichment. TXCO alleged that Peregrine impermissibly used TXCO's confidential information and trade secrets to acquire oil and gas leases in the Maverick Basin of south Texas. (ECF No. 43) The rights in and to this adversary proceeding against Peregrine were preserved in the Plan and transferred from the Debtor to RTXCO, which continued the pursuit of this action. A forty-one day trial took place between May 31, 2011 and September 12, 2011. The Court will render judgment for RTXCO on its misappropriation of trade secrets cause of action, but all other requested relief will be denied.

### JURISDICTION

This is a not a core proceeding under 28 U.S.C. § 157(b)(2). The parties have consented, both in their filed pleadings and verbally on the record, to the entry of a final judgment by this

Court. *See* 28 U.S.C. § 157(c)(1)–(2) (2005). This Opinion constitutes the findings of fact and conclusions of law of the Court, pursuant to FED. R. BANKR. P. 7052. In the event that this Court does not have the authority to render a final judgment, this Opinion may be treated as proposed findings of fact and conclusions of law subject to *de novo* review. 28 U.S.C. § 158(c)(1) (2005); FED. R. BANKR. P. 9033(d).

**FACTS**

I.     ***Introduction to the Maverick Basin and the Cage Ranch.***

The Maverick Basin is an area of southwest Texas that borders Mexico and is comprised of parts of Maverick, Dimmit, Zavala, and Webb Counties. (Pl.'s Ex. 580) It contains a wealth of hydrocarbons in several distinct geologic formations piled atop one another under the earth's surface, including the Eagle Ford and Pearsall shales and the Georgetown and Glen Rose formations. (Pl.'s Ex. 24) The Eagle Ford Shale, which is actually a borderline carbonate reservoir rather than a shale, is a highly calcareous source rock for other formations. The high carbonate content makes the formation brittle and easier to stimulate through hydraulic fracturing or "fracking," which is significant because both oil and natural gas are capable of being produced at higher rates of recovery than in other traditional shale plays.[1] (Pl.'s Ex. 580; Tr. 96, May 31, 2011 p.m.) Oil and gas drilling in the Maverick Basin historically yielded hit-or-miss results because vertical drilling was inadequate to consistently and economically produce hydrocarbons. (Pl.'s Ex. 580) In October 2008, an announcement by Petrohawk Energy Corporation of the completion of a horizontal Eagle Ford well in La Salle County, Texas, east of the Maverick

---

[1] For the benefit of the parties, this Opinion references the unofficial daily trial transcript, which consists of two volumes for each day of testimony. Parenthetical citations are formatted according to Bluebook Rule B7. *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION B7, at 19–22 (Columbia Law Review Ass'n et. al. eds., 19th ed. 2010).

Basin, drew new attention to the long-known, but previously undeveloped, geologic formation. (*Id.*) By that time, horizontal drilling had become widely used in the oil and gas industry. Consequently, the Maverick Basin and other areas within the Eagle Ford trend experienced a rapid increase in leasing and drilling activity throughout 2009 and 2010.

One of the largest ranches in Maverick County, the Cage Ranch, consists of approximately 65,000 acres. (Tr. 11–12, June 1, 2011 a.m.) For oil and gas leasing purposes, the Cage was divided into a 25,000-acre southern portion ("Block A"), and a roughly 24,744-acre northern portion ("Block B").[2] (Pl.'s Ex. 73; Tr. 19–22, 85, June 1, 2011 a.m.) Mineral ownership of the Cage Ranch is subdivided in a checkerboard pattern across the entire property. (Pl.'s Ex. 73) Each square in the checkerboard contains 640 acres. (Tr. 15–25, July 1, 2011 a.m.) One half of the checkerboard squares (the "Cage Acreage" or the "Dark Squares") are owned by the Cage family and Doug Vander Ploeg (collectively, the "Cage Owners") in an undivided 15/16 and 1/16 interest, respectively. (*Id.*) Ownership of the other half of the checkerboard (the "BLS Acreage" or the "White Squares") is split between three groups of owners—the Briscoe group, the Lloyd group, and the West-Stedman group (collectively, the "BLS Owners" or "BLS Lessors"). (*Id.*) Within each of the 640-acre checkerboard squares of the BLS Acreage, 480 acres are owned by the Briscoe and Lloyd groups in varying proportions, and 160 acres are owned by the West-Stedman group. (*Id.*)

## II.  *TXCO's Acquisition of the Cage Ranch.*

"The Exploration Company" was formed in 1979 and began operations in the Maverick Basin in 1989 in formations other than the Eagle Ford. (Tr. 83–86, May 31, 2011 p.m.) In approximately 2007, it changed its name to TXCO Resources, Inc. Between 1989 and 2008,

---

[2] The remaining Cage Ranch acreage is located to the north of Block B in an area known as the Winship Ranch. Further discussion of this acreage is not necessary for the purposes of this Opinion. (Tr. 17–20, July 1, 2011 a.m.)

4

TXCO dramatically increased its acreage position in the area, eventually acquiring leases on roughly one million net acres of land in Dimmit, Maverick, Webb, and Zavala counties. (*Id.*) Included in TXCO's assets was an interest in Block B of the Cage Ranch, which it acquired in a 2005 deal with Saxet Energy Corporation. (Tr. 15–25, July 1, 2011 a.m.) TXCO was an early entrant in the Maverick Basin and drilled the first horizontal Eagle Ford well. (Tr. 94, May 31, 2011 p.m.)

Because of the complicated mineral ownership of the Cage Ranch, TXCO's interest in Block B consisted of several distinct leases. (Tr. 15–25, July 1, 2011 a.m.) The Block B Cage Acreage was held by leases between TXCO and the Cage Owners. (*Id.*) The 24,744-acre Block B BLS Acreage was held by leases which treated the property as if it were divided into three roughly proportionate subsections across the northern, central, and southern portions of the property ("Section A", "Section B", and "Section C"). (*Id.*) The BLS Owners executed multiple leases with TXCO according to their proportional ownership in Section A, Section B, and Section C. (*Id.*; Pl.'s Ex. 645) During the primary term of the leases, drilling a well anywhere on the BLS Acreage satisfied TXCO's drilling requirements to maintain its leases on Section A, Section B, and Section C, regardless of whether a well was drilled on that particular subsection during the primary term. (Tr. 15–25, July 1, 2011 a.m.) Once the secondary term began, TXCO's leases on the BLS Acreage required it to maintain production or conduct continuous drilling operations on each subsection. (Trs. 15–25, July 1, 2011 a.m., 85–88, July 5, 2011 a.m.) If TXCO failed to meet any of its obligations in the secondary term as to Section A, Section B, or Section C, its lease terminated on that acreage. (Tr. 15–25, July 1, 2011 a.m.)

5

### III.    *TXCO's Farmouts with Encana and Anadarko*.

In 2005, TXCO's board of directors decided to expand the company by partnering with another company. (Tr. 85, May 31, 2011 p.m.) For that purpose, the company entered into a farmout and Joint Exploration Agreement ("JEA") with Encana Oil & Gas (USA) Inc. ("Encana").[3] (Pl.'s Ex. 86; Tr. 86, May 31, 2011 p.m.) Under the JEA, Encana conducted drilling operations on TXCO's leased acreage to satisfy TXCO's leasehold obligations. (Trs. 85–87, May 31, 2011 p.m., 9–12, June 1, 2011 a.m.) In exchange, Encana received a 50% working interest in TXCO's acreage on which it drilled and completed wells. (*Id.*) TXCO and Encana thereafter became equal owners or "partners" on approximately 200,000 acres. (*Id.*) Included in Encana's acquired interests was Block B of the BLS and Cage Acreage. (Tr. 9–16, June 1, 2011 a.m.)

TXCO and Encana's relationship changed as Encana successfully drilled wells and earned portions of TXCO's acreage. Eventually, TXCO sought to alter the relationship to gain back acreage it assigned under the 2005 agreement. Because TXCO was not financially able to buy Encana's 50% interest, TXCO and Encana entered into a new JEA on September 20, 2007 (the "Encana Farmout"), which allowed TXCO to reacquire acreage through several phases of drilling operations on the acreage previously acquired by Encana.[4] (Tr. 9–16, June 1, 2011 a.m.)

---

[3] A joint exploration agreement is often a component of a farmout agreement in the oil and gas industry. Under a farmout agreement, an operator which holds a working interest in an oil and gas lease will assign part of its interest to another operator in exchange for fulfilling specified drilling and testing requirements under the lease. The operator acquiring an interest by conducting drilling operations pays the costs of drilling, and thereby "farms in" to the acreage. Traditional categorization of these agreements is becoming difficult, as companies frequently use a hybrid approach in drafting joint exploration agreements.

[4] The Encana Farmout required TXCO to drill a set number of wells on Encana acreage in three phases of drilling determined by stipulated time frames. (Tr. 9–11, June 1, 2011 a.m.) At the end of each successfully completed phase, TXCO could elect to enter the next phase and continue under the agreement, or it could opt out and terminate the relationship. (*Id.*) If TXCO failed to complete drilling within a given phase and Encana's lease on that acreage terminated, TXCO was required to pay a penalty of $150 per acre lost. (Tr. 16, June 1, 2011 a.m.) By April 2009,

The Encana Farmout provided for the mutual exchange of geological, geophysical, engineering, and production data. (Tr. 85–88, May 31, 2011 p.m.) Under the agreement, each party would maintain the confidentiality of the information it received. (Tr. 13, June 1, 2011 a.m.)

During this time frame, Anadarko approached TXCO regarding its interest in mutually developing oil and gas properties in the Maverick Basin. (Tr. 86–89, May 31, 2011 p.m.) TXCO agreed to execute a confidentiality agreement with Anadarko which allowed for the exchange of information, provided that if no deal was reached, neither party would lease acreage within a contractually-defined area of mutual interest ("AMI"). (*Id.* at 87–88) Under the agreement, TXCO and Anadarko owed one another a duty to maintain the confidentiality of the information that they received. (Tr. 57, June 2, 2011 a.m.) Although no development agreement was reached, Anadarko acquired approximately 350,000 acres adjacent to TXCO's leasehold position, but outside of the AMI. (Tr. 87, May 31, 2011 p.m.) Anadarko's leasehold interest included Block A of the Cage Ranch. (*Id.*)

On March 1, 2008, a transaction structured similarly to the Encana Farmout was executed between TXCO and Anadarko (the "Anadarko Farmout"). The agreement allowed TXCO to acquire a 50% interest in Anadarko's leased acreage in return for TXCO paying the full cost of drilling wells. (Pl.'s Ex. 87; Tr. 49–55, June 1, 2011 a.m.) As in the Encana Farmout, each company agreed to share confidential subsurface, operations, and production data. (Pl.'s Ex. 87) In Phase I of the Anadarko Farmout, TXCO was required to drill two Eagle Ford wells and two Pearsall wells, which it drilled and completed by March 2009.[5] TXCO spent nearly $30 million

---

TXCO had completed its obligations under Phase I and entered Phase II. (Pl.'s Ex. 385; Tr. 30–35, June 1, 2011 a.m.)

[5] The Anadarko Phase I wells included the Briscoe Chupadera 1-H and San Pedro 2-H Pearsall wells, and the Briscoe Catarina and San Pedro 1-H Eagle Ford wells. (Tr. 52, June 1, 2011 a.m.)

drilling wells under the Anadarko Farmout, which allowed it to acquire confidential technical data on five Anadarko science wells.[6] (Pl.'s Ex. 87; Trs. 68, June 1, 2011 p.m., 67–69, 154–56, June 10, 2011 p.m.) This data included well drilling, completion, testing, and production data; core data; seismic and microseismic data; pressure-volume-temperature ("PVT") data; well schedules; Authorizations for Expenditure ("AFE") and other operations data; estimated ultimate recovery ("EUR") data; well logs; financial analysis information; geologic maps including isopach, depth, and structure maps; land and lease files; and land and lease maps. (Pl.'s Exs. 4, 24, 221, 341, 384, 394, 417, 428, 444, 451, 459, 477, 511, 516, 527, 532, 540, 579, 588, 616, 624) At some point during Phase I of the Anadarko Farmout, TXCO partnered with St. Mary Exploration Company ("St. Mary") to assign half of its 50% interest in exchange for St. Mary's assumption of half of TXCO's drilling obligations. (Tr. 49–55, June 1, 2011 a.m.)

## IV.   *TXCO's Financial Problems and Efforts to Avoid Bankruptcy.*

The price of oil per barrel fell from almost $147 in July 2008, to $35 in January 2009. (*Id.* at 102–03) In December 2008, TXCO was faced with a shortfall of cash flow that put it in default of covenants to its secured lender. (*Id.* at 102–04) TXCO's financial difficulty was due to a number of factors, including the dramatically falling price of oil and cost overruns. (*Id.*) In response, TXCO shut down its drilling operations, with the exception of wells it was committed to drilling and operating under its existing oil and gas leases. (*Id.*) Additionally, TXCO engaged Goldman Sachs to find potential buyers for TXCO's assets. (*Id.* at 105)

---

[6] A science well is an initial well on which an operator spends more money for testing and data recording than it normally spends. Operators drill science wells to gain information about a mineral formation early in its development so that uncertainty and risk are reduced in subsequently drilled wells. (Tr. 111–12, May 31, 2011 p.m.) The science well bore can be reused for subsequent drilling and completions. (Tr. 56–57, June 1, 2011 a.m.)

Under the terms of its engagement, Goldman Sachs identified potentially interested parties, arranged meetings, and managed the assembly of company data. (*Id.* at 105–08) To facilitate a potential sale, TXCO and Goldman Sachs developed and distributed teaser presentations to entice potential buyers. (Pl.'s Ex. 24; Tr. 105–08, June 1, 2011 a.m.) When a third party expressed interest, TXCO would require the execution of a confidentiality agreement and provide a company presentation ("Management Presentation"), which generally showed TXCO's assets and potential oil and gas recovery within different horizons in which it had an interest. (Pl.'s Exs. 1, 24; Tr. 105–08, June 1, 2011 a.m.) These presentations contained both public and nonpublic information. If a company had further interest after the initial presentation, it was given further access to TXCO's private information. (Tr. 105–08, June 1, 2011 a.m.)

## V.     *TXCO's Data Provided a Competitive Advantage: Knowledge is King*.

Because of TXCO's experience in the Maverick Basin compared to the majority of other exploration and production ("E&P") companies which became attracted to the developing area in 2009, TXCO held the accumulated technical, geologic, geophysical, and engineering knowledge required to evaluate the economic viability of acreage in the region. (Trs. 9–11, June 27, 2011 a.m., 5–13, 30–43, June 1, 2011 p.m.) This information would have been extremely valuable to an operator entering a newly discovered field or a field in which no significant amount of economic production had been obtained. When an up-and-coming oil and gas play such as the Eagle Ford shale is identified, E&P companies compete to acquire unleased acreage. (Tr. 9–13, June 27, 2011 a.m.) In such a "land rush," tens of thousands of acres can be leased in a short time by companies attempting to obtain the best acreage in the play. (Tr. 99–100, June 1, 2011 a.m.) Any available information on potential oil and gas recovery thus allows a company to acquire

leases on land with the best prospects for economic recovery. "Knowledge is king." (Tr. 103, May 31, 2011 p.m.)

The information obtained by TXCO was valuable not only because of the nature of the data itself, but also because of the lack of publicly available information to competing companies vying for leases in the area once the land rush began. (Tr. 165–66, June 27, 2011 p.m.) Albert Conly, a turnaround consultant for TXCO, testified that TXCO's subsurface, production, and operations data would have provided a unique competitive advantage to anyone in possession of the information, particularly in May through September 2009.[7] (Tr. 43, 59–60, July 14, 2011 p.m.) TXCO attempted to protect its competitive position by maintaining the confidentiality of data both inside and outside the company. (Trs. 25, 48–53, 67–68, 135, 150, June 1, 2011 p.m., 63–92, July 6, 2011 p.m.) Although it made periodic disclosures of limited amounts of data, TXCO restricted the flow of information within and outside the company on a need-to-know basis and limited the type and amount of data that was publicly released. (Tr. 48–49, 57–64, 75, 97–102, June 1, 2011 a.m.) TXCO disclosed its detailed information only to companies that were obligated to maintain the confidentiality of the data. (*Id.*)

**VI.**  *Peregrine and TXCO Meet.*

Peregrine Petroleum, L.L.C. is an E&P company with substantial capital resources that was founded in October 2008 by a group of Hunt Petroleum heirs and their business associates. (Pl.'s Ex. 72; Tr. 136–37, June 1, 2011 a.m.) In early 2009, Peregrine began efforts to obtain an acreage position in the Maverick Basin. (Trs. 15–16, Aug. 8, 2011 p.m., 71, 77–78, June 28, 2011 p.m.) Peregrine was introduced to TXCO through Rusty Kelley at Goldman Sachs to

---

[7] Conly testified that "[TXCO's] competitive advantage was the acreage position, the contiguous acreage position that they held and the data they obtained from drilling successful and unsuccessful wells, shooting seismic, and evaluation of information they obtained from their trading and joint interest partners." (Tr. 43, July 14, 2011 p.m.)

evaluate a potential sale that might assist TXCO's strained financial situation. (Tr. 113–17, June 1, 2011 a.m.) On February 26, 2009, Peregrine signed a confidentiality agreement with TXCO (the "Confidentiality Agreement" or "CA") that allowed it to receive subsurface, production, and operations information about TXCO's Maverick Basin properties. (Pl.'s Ex. 1)

The Confidentiality Agreement defined any information furnished by TXCO as "Evaluation Material," except for information: (i) already in the possession of Peregrine, provided that it was not known to be subject to another confidentiality agreement or other obligation of secrecy; (ii) generally available to the public; or (iii) available to Peregrine on a non-confidential basis from a source other than TXCO, provided that the source was not known by Peregrine to be bound by a confidentiality agreement or other obligation of secrecy. (*Id.*) Under the CA, Peregrine's access to the Evaluation Material was conditioned on the premise that it would be used solely for the purpose of evaluating a transaction between TXCO and Peregrine. (*Id.*) The CA further provided that Peregrine would not "acquire, or assist, advise or encourage any other persons in acquiring, directly or indirectly, control of . . . any of [TXCO]'s . . . assets for a period of three years." (*Id.*) If no transaction was consummated, Peregrine was required to return all Evaluation Material and destroy all copies. (*Id.*)

On March 5, 2009, Peregrine's CEO, chief advisor, and technical staff were given a narrated multi-hour slide Management Presentation by James Sigmon, TXCO's then-CEO and chairman of the board, and Gary Grinsfelder, TXCO's then-president, detailing TXCO's leasehold assets and drilling activities. (Pl.'s Ex. 511; Trs. 135–36, June 1, 2011 a.m., 29–32, July 8, 2011 a.m.) The 186-slide Management Presentation included information that TXCO had used in previous public presentations and also information that had not been publicly disclosed by TXCO. (Pl.'s Ex. 511) Some slides in the presentation contained public information, other

11

slides contained confidential information, and the remaining slides contained a combination of both public and confidential information. (Tr. 7–60, 77–84, 107, June 1, 2011 p.m.)

On March 13, 2009, eight days after the initial meeting, Peregrine sent its technical team[8] to TXCO's San Antonio office for a second meeting. (Tr. 45–51, June 7, 2011 a.m.) In preparation, Peregrine requested that TXCO make available specified confidential information regarding TXCO's lease and drilling activities. (Pl.'s Ex. 204) Peregrine's staff met one-on-one with TXCO employees,[9] who were instructed that a confidentiality agreement was in place, and they were free to share TXCO's information. (Tr. 45–51, June 7, 2011 a.m.) After the meeting, Peregrine requested and received more confidential information from TXCO that was not available at the time of the previous meetings. (Pl.'s Exs. 30, 143, 146, 150; 179; Tr. 124, June 1, 2011 p.m.) Despite their efforts, TXCO and Peregrine were unable to reach an agreement.

**VII.**     ***TXCO's Efforts to Keep Acreage and Bankruptcy Filing.***

In March 2009, the BLS Lessors determined that no active drilling or production of oil and gas were taking place on Section A or Section C and requested that TXCO execute releases on its leases covering those lands. (Pl.'s Ex. 5; Tr. 20–30, July 1, 2011 a.m.) At the time, Section B was held by TXCO's continuous drilling operations on the property. (***Id.***) Although TXCO lost the Section A and Section C leases, it continued discussions with the BLS Owners after filing bankruptcy to take new leases on Section A and Section C, and attempted to maintain its leases on Section B of the BLS Acreage. (Pl.'s Ex. 6) TXCO's lease on Section B expired in May 2009

---

[8] Peregrine's representatives included: Jeremy Greene, Senior Vice President and Peregrine's corporate representative at trial; Larry Miller, a geologist and Peregrine's Vice President of Exploration and Business Development; Bill Bishop, Vice President of Land; and Tammy Gannon, Vice President of Engineering.

[9] TXCO employees at the meeting included: Jim Sigmon, CEO; Gary Grinsfelder, President; Gary Nyland, a geoscientist focused primarily on the Glen Rose formation; Steve Young, a geoscientist focused primarily on the Eagle Ford and Pearsall formations; Bob Lee, Land Manager; Sherry Fletcher, Reservoir Manager; and Greg Cooper, petroleum landman.

because TXCO was unable to finance continuous drilling operations required to extend the secondary term of the lease. (Tr. 86–99, July 5, 2011 a.m.) At about the same time, TXCO filed its Chapter 11 bankruptcy cases on May 17, 2009. Although it lost its lease covering Section B, TXCO continued to operate wells on Section B that were held by production. (*Id.* at 95–96)

Because of the checkerboard mineral ownership of the Cage Ranch, TXCO wanted to maintain its leases on the Cage Acreage and reacquire the BLS Acreage in order to effectively develop Block B with horizontal drilling. (Trs. 37–40, July 1, 2011 a.m., 97–99, July 5, 2011 a.m.) To facilitate its reacquisition of the BLS Acreage, TXCO obtained Debtor in Possession ("DIP") financing to pay royalties, renew leases, and drill wells necessary to keep its existing leases in force. TXCO continued its efforts to negotiate with the BLS Owners through the summer of 2009, but a lease renewal was not achieved. (Pl.'s Ex. 185) In addition to its efforts to negotiate with the BLS Owners, TXCO attempted to save its lease on the Cage Acreage under the Encana Farmout by again meeting with Peregrine. (Tr. 61–64, Aug. 29, 2011 a.m.) On June 19, 2009, TXCO met with Peregrine in a third meeting and offered to bring in Peregrine as a partner under the Encana Farmout. (*Id.*) Peregrine was not interested, and the meeting ended with no plans to continue negotiations. (*Id.*)

**VIII.  *Robert Patterson and the Hamilton Ranch*.**

Robert Patterson is an engineer and operator who performs drilling for E&P companies in south Texas through his companies, Patterson Energy Corporation and PE Consulting Services. (Tr. 5–12, June 13, 2011 a.m.) Patterson Energy Corporation conducts drilling operations on-site for E&P companies, and PE Consulting Services provides contract labor at the drilling sites. It was through these services that Patterson became involved with many projects in the Maverick Basin. Patterson was retained by TXCO to direct and coordinate operations at all TXCO well

sites and provide personnel to operate the rigs. (*Id.*) In addition to his drilling operations in south Texas, Patterson promotes deals between land owners and oil and gas E&P companies. (*Id.* at 18–23)

In late 2008, Patterson was approached by representatives of Blue Star Exploration Company ("Blue Star") to recomplete two wells Blue Star had on the Hamilton Ranch, which consisted of approximately 26,000 acres located in Maverick County adjacent to the Cage Ranch. (Pl.'s Exs. 33, 524; Trs. 19–23, 30, June 13, 2011 a.m., 35–39, June 14, 2011 p.m.) Under their agreement, Patterson would perform the drilling for 25% of Blue Star's working interest. (Tr. 19, June 13, 2011 a.m.) Blue Star attempted to negotiate a lease extension with J.R. and Clayton Hamilton, owners of the Hamilton Ranch, but was unsuccessful. (Tr. 79–80, June 13, 2011 p.m.) After J.R. Hamilton obtained releases of Blue Star's leases covering the Hamilton Ranch, Patterson began negotiating on his own with J.R. and Clayton Hamilton to lease the property himself. (*Id.*)

After he began negotiating, Patterson met with Jeff Bookout, chief operating officer and vice president of TXCO, and Jim Sigmon at TXCO's offices. Patterson informed them that he was about to lease the Hamilton Ranch, and offered to sell the lease to TXCO. (Trs. 165–68, June 1, 2011 p.m., 35–40, June 14, 2011 p.m.) Sigmon responded that he was not interested because TXCO was unsuccessful in a prior attempt to obtain an oil and gas lease on the property, did not have the money to lease, and could not work with Mr. Hamilton. (*Id.*) After Sigmon left the room, Bookout told Patterson that Peregrine might be interested in the opportunity and suggested Patterson contact Peregrine. (Tr. 101–02, June 7, 2011 a.m.) Patterson "cold called" Peregrine by email on April 30, 2009 to promote a possible transaction on the Hamilton Ranch. (Pl.'s Ex. 33; Tr. 29–35, June 13, 2011 a.m.) In the email, Patterson explained that he was in the

process of taking a lease that would give him 26,000 acres in the Maverick Basin at $450 per acre and was looking for a partner to develop the property. (Pl.'s Ex. 33) Bill Bishop, vice president of land at Peregrine, responded that he would be interested in the project, and the two parties set up a meeting on May 12, 2009 at Patterson's office in New Braunfels, Texas. (*Id.*)

At the meeting, Peregrine and Patterson reached a verbal arrangement to mutually develop properties in the Maverick Basin whereby Patterson Energy would participate in lease negotiations and conduct drilling operations on any acquired acreage. (Pl.'s Ex. 561; Tr. 76, 81, June 13, 2011 a.m.) The agreement provided for an AMI covering the Hamilton Ranch, plus an area extending outward two miles from the perimeter of the property. (Tr. 81, June 13, 2011 a.m.) Under the agreement, Peregrine and Patterson would have a 75% and 25% interest, respectively, in any working interests obtained on land within the AMI. (Def.'s Exs. 162, 706; Pl.'s Ex. 561) After learning that Patterson had included a promotional fee for himself in the deal, Peregrine reduced Patterson's interest to 5% and executed a lease on part of the Hamilton Ranch for $525 per acre in October 2009.

### IX.    *Bookout and the Redemption Farmout*.

James Jeffrey "Jeff" Bookout was hired by TXCO in April 2002, and became chief operating officer and vice president in June 2003. (Tr. 5–8, June 7, 2011 a.m.) He was primarily responsible for ensuring the drilling and completion of TXCO's wells. (*Id.*) Bookout and Robert Patterson formed a close friendship several years prior while working together as petroleum engineers at another E&P company. (Tr. 9–12, June 13, 2011 a.m.) After Bookout was hired, TXCO promptly retained Patterson Energy Corporation and PE Consulting Services to conduct its drilling operations at well sites in the Maverick Basin. Under the TXCO employee agreement

he signed in December 2006, Bookout specifically acknowledged the duty to preserve TXCO's confidential information. (Pl.'s Ex. 437)

Shortly before TXCO entered bankruptcy, TXCO's board of directors concluded that Bookout was partially responsible for TXCO's financial situation. (Tr. 15, June 2, 2011 a.m.) On May 7, 2009, Bookout was terminated from TXCO, and a separation agreement was executed in which he received a wage continuation and benefits in return for pledging a continuing duty of loyalty to the company. (Pl.'s Ex. 438; Tr. 15–19, June 2, 2011 a.m.) Bookout immediately began to work with Robert Patterson in an attempt to arrange oil and gas transactions in the Maverick Basin. (Pl.'s Exs. 154, 449; Tr. 28, 102, 107–08, June 7, 2011 a.m.) Together, Bookout and Patterson formed Redemption Oil & Gas, L.L.C. ("Redemption") to pursue one of these endeavors. (Pl.'s Ex. 270, Tr. 31–32, June 7, 2011 a.m.) Bookout chose the name Redemption because "we are all saved by HIS grace . . . and we can get a little redemption back [sic] from TXCO and Anadarko." (*Id.*) Despite being terminated, Bookout utilized TXCO's resources and personnel to obtain information related to his efforts. (Pl.'s Ex. 12; Tr. 41–44, June 2, 2011 p.m.)

After its May 17 bankruptcy filing, TXCO attempted to hold the acreage it acquired through Phase I and Phase II of the Encana Farmout by obtaining DIP loans to drill. (Tr. 30–32, June 2, 2011 a.m.) Under Phase II of the Encana Farmout, TXCO had to drill three wells to maintain its interest in the Block B Cage Acreage. (Pl.'s Ex. 86; Tr. 31–33, June 2, 2011 a.m.) On June 8, 2009, Bookout proposed that Redemption drill wells on the Encana Farmout and other TXCO acreage to satisfy TXCO's drilling and leasehold obligations (the "Redemption Farmout"). (Pl.'s Ex. 729; Tr. 31–39, June 2, 2011 a.m.) In exchange, TXCO would assign to Redemption a 50% working interest in the acreage saved by Redemption's drilling operations and name Redemption as the operator of those wells. (*Id.*) Under the agreement, Redemption

16

could have acquired an interest in up to approximately 17,000 acres of the 200,000-acre Encana Farmout. (Pl.'s Ex. 459; Tr. 31–39, June 2, 2011 a.m.) To maximize the amount of acreage saved before TXCO's leases expired, Redemption was able to choose where it drilled on any portion of the Encana Farmout. (*Id.*) Bookout told Sigmon that a private equity company, Scotia Waterous ("Scotia"), had agreed to provide funding on the project. (Tr. 36–39, June 2, 2011 a.m.)

While finalizing the Redemption Farmout with TXCO, Bookout contacted Peregrine and arranged a meeting on June 19, 2009. (Pl.'s Ex. 162, 459; Tr. 65, Aug. 29, 2011 a.m.) At the meeting, Bookout stated he was hesitant to partner with Scotia for equity funding and thought an arrangement with Peregrine was preferable. (*Id.*) He proposed that Peregrine fund the Redemption Farmout in exchange for a payback of its initial investment and a working interest in each well drilled. (Pl.'s Exs. 162, 164, 459) The terms of the deal were almost identical to those Redemption proposed to TXCO, except Redemption would retain a 25% working interest in the drilled acreage, and Bookout would receive a three-year employment contract with Peregrine. (*Id.*) In fact, TXCO had presented the same farmout opportunity to Peregrine earlier that day, but Peregrine declined to participate. (Tr. 65, Aug. 29, 2011 a.m.) Bookout and Peregrine were similarly unable to reach a deal, and Redemption ultimately obtained equity funding from Scotia for Redemption's drilling operations. (Pl.'s Exs. 576, 580; Def.'s Ex. 217; Tr. 34–40, June 2, 2011 a.m.) The Redemption Farmout was approved by this Court after notice and hearing. (Case No. 09-51807, ECF No. 554)

After beginning to work together on the Hamilton Ranch lease and Redemption Farmout, Bookout and Patterson immediately began to pass TXCO's proprietary subsurface, production, and operations data to Peregrine in furtherance of their efforts to broker oil and gas transactions. (Tr. 20, June 2, 2011 a.m.) Multiple communications between Bookout, Patterson, Peregrine, and

TXCO employees demonstrate that Peregrine actively sought TXCO's data, and that Bookout and Patterson were responsible for Peregrine's receipt of TXCO's confidential and trade secret information throughout 2009.[10] (Tr. 21–124, June 2, 2011 a.m.)

## X.   *Peregrine's Efforts to Lease the Cage Ranch.*

On April 16, 2009, Peregrine met with Genesis Oil and Gas Consultants ("Genesis") to discuss undertaking a joint effort to acquire oil and gas leases in the Maverick Basin. (Pl.'s Ex. 99; Tr. 47, July 11, 2011 a.m.) Genesis is an oil and gas lease broker. After the initial meeting, Peregrine and Genesis entered into an agreement whereby Genesis would secure oil and gas leases for Peregrine in a defined focus area of the Eagle Ford shale. (Pl.'s Exs. 99, 100; Tr. 47– 53, July 11, 2011 a.m.) Notably, Genesis obtained a confidentiality agreement from Peregrine for every potential lease presented. Genesis and Peregrine subsequently began efforts to meet with the BLS Owners and the Cage Owners in order to obtain leases on Block A and Block B. (Tr. 69–70, July 11, 2011 p.m.)

### A.   *Block B of the Cage Ranch.*

Bill Bishop arranged a meeting held July 1, 2009 between representatives from Peregrine, Genesis, Patterson Energy, and the BLS Owners, at which Peregrine gave a presentation to the BLS Owners introducing the company, communicating their desire to lease the BLS half of the Block B Cage Ranch checkerboard, and explaining their drilling plans for the property. (Pl.'s Exs. 72, 73; Tr. 16–21, June 8, 2011 a.m.) Over the next three months, Peregrine continued to

---

[10] Pl.'s Exs. 154 (retrograde testing, production data), 417 (well logs), 415 (well logs), 420 (Anadarko well five-stage frack), 37 (wellbore completion, frack technique), 162 (Redemption Farmout), 459 (Encana Farmout terms), 537 (Encana Farmout update), 128 (Anadarko wells), 128 (AFE), 160 (BTU content), 159 (decline curves), 450 (flowback data), 452 (flowback data), 450 (wellbore sketch), 540 (two-stage frack treatment), 546 (flowback data), 48 (flowback data), 226 (flowback data, completion costs), 54 (flowback data), 170 (flowback data), 52, 171 (flowback data), 56 (flowback data), 59 (flowback data), 528 (flowback data), 203 (flowback data), 174 (flowback data), 538 (flowback data), 566 (well bore schematics).

work with Genesis to coordinate communications between Peregrine and the BLS Owners and finalize the terms of a lease on the Block B BLS Acreage. (Pl.'s Ex. 99; Trs. 47, July 11, 2011 a.m., 20–24, June 8, 2011 a.m.) The BLS Owners ultimately received offers to lease the BLS Acreage from Joint Resources, TXCO, and Peregrine. (Tr. 25–40, 68, July 5, 2011 a.m.) Joint Resources offered a $450 per acre bonus payment and 24% royalty on a three-year term lease. (Tr. 29, 70, July 5, 2011 a.m.) TXCO offered a $100 per acre bonus payment and 24% royalty on a two-year term lease. (Tr. 76, July 5, 2011 a.m.) Peregrine offered a bonus payment of $250 per acre and 25% royalty on a three-year term lease. (Pl.'s Ex. 77; Tr. 70, July 5, 2011 a.m.) The BLS Owners decided to lease to Peregrine and on October 6, 2009, Peregrine obtained a lease on the BLS Acreage. (Pl.'s Exs. 99, 120; Tr. 93, July 5, 2011 a.m.)

At a later meeting with the Cage Owners on August 11, 2009, Peregrine and Genesis attempted to obtain a lease on the other half of the Block B checkerboard by proposing a bonus of $250 per acre on a four-year term lease of the Cage Acreage.[11] (Tr. 71, July 11, 2011 p.m.) The offer included Doug Vander Ploeg's 1/16 interest and the Cage family's 15/16 interest in Block B. (Pl.'s Exs. 119, 120, 464; Tr. 80–96, July 11, 2011 p.m.) At the time, Block B of the Cage Acreage was under lease to TXCO, but the leases would expire on October 1, 2009 unless a well was drilled that held the acreage by production. (*Id.*) At some point after the meeting, Peregrine learned that a well was drilled that would extend TXCO's leasehold interest in the Cage Acreage past the anticipated October 1, 2009 expiration date. (Pl.'s Exs. 119, 472; Tr. 90–107, July 11, 2011 p.m.) Unsure how long the lease would be extended or otherwise held by production, Peregrine tried to determine the status of TXCO's lease and considered a top lease

---

[11] Because Presnall Cage was unable to attend the meeting, Peregrine sent him a copy of the presentation. (Tr. 91–93, July 11, 2011 p.m.)

on the Cage Acreage.[12] (Pl.'s Exs. 119, 121; Tr. 93–100, July 11, 2011 p.m.) Although Bill Bishop testified that Peregrine was not interested in a top lease, Peregrine and Genesis continued their efforts to lease the Cage Acreage. (Pl.'s Ex. 110; Tr. 104, July 11, 2011 p.m.)

### B.  *Block A of the Cage Ranch.*

In 2009, the BLS Acreage and Cage Acreage in Block A of the Cage Ranch were under lease to Anadarko, which resulted in Anadarko having a 100% interest in the BLS portion and a 15/16 interest in the Cage portion of the southern checkerboard until its leases expired in December 2010. (Pl.'s Ex. 90; Tr. 85–88, July 11, 2011 p.m.) Doug Vander Ploeg, who owned an unleased 1/16 interest in the Cage portion of Block A, tentatively agreed to lease his interest to Peregrine, subject to the execution of a written lease. (Pl.'s Ex. 95; Tr. 85–88, July 11, 2011 p.m.) Peregrine, however, was concerned that it would not be able to obtain an acceptable JEA with Anadarko to develop Block A. (*Id.*) Peregrine furnished Vander Ploeg with a lease proposal that Vander Ploeg did not accept, and the companies ceased negotiations without reaching a deal. (*Id.*)

### XI.  *TXCO Sells Assets and Sues Peregrine.*

On September 9, 2009, this Court approved TXCO's Application for Employment of Global Hunter Securities, LLC ("Global Hunter") as Financial Advisors and Investment Bankers to TXCO, and an order was entered on September 23, 2009. (Case No. 09-51807, ECF No. 585) In this role, Global Hunter provided informational reviews to over 150 parties with an interest in purchasing assets of TXCO. (*Id.* at ECF No. 736) After undertaking due diligence, Newfield submitted a proposal to Global Hunter to acquire TXCO's assets on October 15, 2009, and on

---

[12] A top lease is an oil and gas lease that is executed on property subject to a prior oil and gas lease with a different lessee. The bonus payment is tendered at the signing of the lease, but the lease becomes effective only after the expiration or termination of the preexisting lease. (Pl.'s Ex. 119)

November 6, 2009, a Purchase and Sale Agreement was executed, subject to court approval, which provided for the sale of most of TXCO's assets to Newfield for $223 million. (*Id.*; Pl.'s Ex. 726; Tr. 55–56, July 14, 2011 a.m.) After executing the Purchase and Sale Agreement, TXCO began drafting a plan of reorganization, but continued to consider other offers because the original agreement did not provide sufficient funds to pay TXCO's creditors in full. (Tr. 57–60, July 14, 2011 a.m.) Anadarko expressed an interest at that time, and after some negotiations, Newfield and Anadarko entered a joint transaction for the purchase of 90% of TXCO's assets, with the remaining assets being transferred to a liquidating trust. (*Id.* at 65–70) The sale was proposed under TXCO's plan of reorganization and filed on November 12, 2009. (Case No. 09-51807, ECF No. 765)

While negotiating the Purchase and Sale Agreement, TXCO discovered that Peregrine had leased the BLS Acreage and began to evaluate filing suit against Peregrine. (Tr. 56–57, July 14, 2011 a.m.) TXCO filed this adversary proceeding against Peregrine on November 23, 2009, alleging Peregrine misappropriated TXCO's confidential and proprietary information, among other causes of action. On January 27, 2010, this Court confirmed TXCO's Second Amended Plan of Reorganization, which included the sale of 90% of TXCO's oil and gas assets to Newfield and Anadarko. (Case No. 09-51807, ECF No. 1204) The remaining oil and gas assets were transferred to the TXCO Liquidating Trust. (*Id.*) Pursuant to the Confirmation Order, the rights in this adversary proceeding against Peregrine were retained and transferred from TXCO to RTXCO, which continued the pursuit of this action. (*Id.*) On May 31, 2011, after eighteen months of pretrial proceedings, a nonjury trial commenced. The forty-one day trial ended September 12, 2011.

ANALYSIS

This case concerns two partially overlapping categories of information: (1) "Evaluation Material," as defined in the Confidentiality Agreement dated February 26, 2009 between TXCO and Peregrine; and (2) trade secrets, as defined by law. RTXCO contends that Peregrine misused both types of information, thus breaching the Confidentiality Agreement, committing misappropriation of trade secrets, and violating the Texas Theft Liability Act. RTXCO also claims that Peregrine, by its misuse of TXCO's trade secrets, tortiously interfered with TXCO's potential business relations with the BLS Lessors, engaged in unfair competition by misappropriation, and was unjustly enriched. The issues arise predominantly from Peregrine's acquisition of the BLS Acreage and the Hamilton Ranch leases, although Peregrine also obtained several smaller leases in the area.

**XII.    MISAPPROPRIATION OF TRADE SECRETS.**

Under Texas law, the elements of misappropriation of trade secrets are the following: (1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages. ***IBP, Inc. v. Klumpe***, 101 S.W.3d 461, 476 (Tex. App.—Amarillo 2001, pet. denied).

**A. *Defining a Trade Secret*.**

**1. *Texas Law on Trade Secrets*.**

Texas law defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." ***In re Bass***, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding) (quoting ***Computer Assocs. Int'l, Inc. v. Altai, Inc.***, 918 S.W.2d 453, 455

(Tex. 1996)). To determine whether a trade secret exists, Texas courts apply the Restatement of

Torts' six-factor test:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of the measures taken by [the company] to guard the secrecy of the information; (4) the value of the information to [the company] and to [the company's] competitors; (5) the amount of effort or money expended by [the company] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Bass*, 113 S.W.3d at 739 (quoting RESTATEMENT OF TORTS §757 cmt. b. (1939)).

The original Restatement's section 757 has been omitted from the Restatement (Second)

of Torts and incorporated into the Restatement (Third) of Unfair Competition. *See* RESTATEMENT

(THIRD) OF UNFAIR COMPETITION § 39 (1995). Additionally, the six-factor test from section 757

is discussed in the Unfair Competition Restatement reporter's notes. *Id.* at reporter's n. cmt. d.

("In determining the existence of a trade secret, many cases rely on the factors identified in

Restatement of Torts § 757, Comment b . . . ."). Texas courts identify trade secrets, proprietary

information, and confidential information separately, but provide them similar protection if the

six-factor test is met. *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 666

(S.D. Tex. 2010) (listing cases).

Because four of the six factors relate to the secrecy of the information, there must be a

substantial amount of attendant secrecy for information to be a trade secret. *See Rugen v.*

*Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). Secrecy is

not limited solely to confidentiality, but also requires that the information not be "generally

known or readily ascertainable by independent investigation." *Id.* Where the information is "so

common, well known or readily ascertainable that it lacks all novelty, uniqueness and originality,

it necessarily lacks the element of privacy necessary to make it legally cognizable as a trade

secret." *Cockerham v. Kerr-McGee Chem. Corp.*, 23 F.3d 101, 105 (5th Cir. 1994) (quoting *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315–16 (5th Cir. 1971)).

While trade secret status has been denied for information that can be readily obtained by observation or contact, *see Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1238–39 (5th Cir. 1978), it has been extended to circumstances where considerable cost and effort is required to obtain the information. *See Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179–80 (5th Cir. 1983) (holding trade secret protection available for customer lists where names and addresses obtainable through trade journals but other valuable information available only at considerable cost). "[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986) (quoting with approval *Water Servs., Inc. v. Tesco Chems., Inc.*, 410 F.2d 163, 173 (5th Cir. 1969)).[13] Thus, a compilation of data may constitute a trade secret even if some of its component information is publicly available. *See Zoecon*, 713 F.2d at 1179–80; *see also Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App.—Corpus Christi 1990, no writ) ("[W]hen money and time are invested in the development of a procedure . . . which is based on an idea which is not new to a particular industry, and when that certain procedure . . . is not generally known, trade secret protection will exist.").

"Although the law requires secrecy, it need not be absolute." *Fourtek*, 790 F.2d at 1200. Clearly the public revelation of information would destroy all secrecy, "but the holder of a secret

---

[13] While *Tesco* concerns Georgia law, both Georgia and Texas adopt the Restatement definition of trade secret. The Fifth Circuit has deemed the language in *Tesco* apposite to trade secret misappropriation cases under Texas law. *Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 736 (5th Cir. 1982).

24

need not remain totally silent." *Id.* A holder may, without losing trade secret protection, communicate a trade secret to employees involved in its use and may likewise communicate it to others pledged to secrecy. *Id.* (quoting RESTATEMENT OF TORTS §757 cmt. b. (1939)). As the Fifth Circuit has explained:

> [A] holder may divulge his information to a limited extent without destroying its status as a trade secret. To hold otherwise would greatly limit the holder's ability to profit from his secret. If disclosure to others is made to further the holder's economic interest, it should, in appropriate circumstances, be considered a limited disclosure that does not destroy the requisite secrecy.

*Fourtek*, 790 F.2d at 1200; *see also Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ) ("When an effort is made to keep material important to a particular business from competitors, trade secret protection will be available.").

In *Fourtek*, the Fifth Circuit determined that Metallurgical's disclosures did not compromise the secrecy required for trade secret protection because Metallurgical divulged its information to only two businesses with whom it was dealing, rather than the public generally, and the disclosures were made to further Metallurgical's economic interests. *Fourtek*, 790 F.2d at 1200. The court noted that Metallurgical's case would have been stronger if it had demonstrated a confidential relationship with the businesses to which it divulged its information, but it declined "to regard this failure as conclusively disproving the limited nature of the disclosures." *Id.*

In *Bass*, the Texas Supreme Court recognized that the six factors are "relevant, but not dispositive" criteria and concluded that "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time." *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003) (orig. proceeding). Rather, "other circumstances could also be relevant to the trade secret analysis." *Id.* at 740. Whether information qualifies as a

trade secret "must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct." *Id.* at 739 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d. (1995)). Therefore, it is necessary to weigh the factors in the context of the surrounding circumstances to determine whether TXCO's acquired information qualified as trade secrets.

## 2. *Trade Secrets in the Oil and Gas Industry.*

Information relevant to oil and gas exploration and production is frequently treated as a trade secret within the industry and at common law. In *Bass*, the Texas Supreme Court expressly held that seismic data and its interpretations were trade secrets. 113 S.W.3d at 742. The court first noted that "[i]t is undisputed that the oil and gas industry typically treats seismic data and all other methods of obtaining subsurface geological data as trade secrets." *Id.* at 740 (collecting cases). The court then analyzed each of the six Restatement factors in light of the circumstances, which established that: (1) Bass maintained the confidentiality of the data at all times and never showed the data to anyone except its employees and agents; (2) only four people had access to the data and all were Bass's agents or employees; (3) employees needed a security card to enter the work area and the data were kept in a vault accessible only to those who were given the combination; (4) the data were a "vital commodity" upon which all interpretation of the land's value was based and had an independent monetary value of between $800,000 and $2,200,000, values which highly favored trade secret protection; (5) the seismic shoot took several months to complete, at considerable expense and inconvenience, although there was no evidence of a specific monetary cost; (6) duplicating the data would have been difficult, expensive, and would have required Bass's permission to conduct another seismic shoot; and (7) licensing the existing

26

data from Bass would also have been similarly expensive. *Id.* at 741–42. The court held that all of the Restatement factors except the fifth, for which there was no specific evidence, weighed in favor of concluding the data were trade secrets. *Id.* at 742.

In the case of *In re XTO Resources I, LP*, the court conditionally granted XTO's writ of mandamus, finding that requests for production seeking, among other things, XTO's reserve estimates, recoverable gas reserve estimates, and projected future revenues for all wells covered by XTO's leases, as well as data identifying "proved undeveloped acreage" and "proved developed not producing acreage" on the leases were entitled to trade secret protection. 248 S.W.3d 898, 903–04 (Tex. App.—Fort Worth 2008, orig. proceeding). In support of its position, XTO submitted affidavits of two XTO employees to the trial court: a senior vice president of engineering and a supervisor of digital log data. *Id.* at 903. The evidence established that: (1) a staff of thirty-one worked exclusively to evaluate XTO's reserves and compile data for XTO's independent contractors who created reserve forecasts; (2) while some of the underlying data were publicly available, the forecasts and conclusions of XTO and its consultants were not; (3) outside of SEC-mandated disclosure of certain aggregate information, the data were not made publicly available or disclosed to anyone outside of XTO, except for consultants involved in the forecasting process and occasionally working interest owners who had a need to know the information; (4) the data were carefully guarded in a secure area in the company's offices restricted by keycard entry and obtainable by XTO personnel only on a need-to-know basis; (5) the information was highly valuable to the company because it directly affected the company's decisions regarding the economic feasibility of developing a given property and gave XTO a competitive advantage in the marketplace; (6) if the information were to have been disclosed, XTO would have lost its competitive advantage because the data would have given competitors

insight into the methodology XTO used to evaluate reserves; (7) XTO spent a considerable amount of money on salaries and independent contractors to evaluate its reserves; and (8) while some of the data underlying its reserve and revenue calculations were publicly available from the Texas Railroad Commission or third-party vendors for a fee and the requesting party could have used the publicly-available data to develop its own reserve projections, the process of transforming the raw data into reserve estimates, and the estimates themselves, would not have necessarily matched those of XTO. *Id.* at 903–04. This difference between calculations was a secret that gave XTO a competitive advantage. *Id.* The court noted that the evidence supporting trade secret status as to Restatement factors one and six was not as compelling as that in *Bass*, 113 S.W.3d 735, 741–42 (Tex. 2003) (orig. proceeding), but nonetheless concluded that the data were trade secrets. *XTO*, 248 S.W.3d at 903–04.[14]

The Fifth Circuit's opinion in *Musser Davis Land Co. v. Union Pacific Resources*, 201 F.3d 561 (5th Cir. 2000), is similarly helpful. While *Musser* concerned Louisiana law, the opinion is relevant because it sheds light upon industry custom and practice. In determining that seismic operations are generally accepted as methods of exploration, the court noted that "mineral exploration operations," as the term is regularly used in the industry, includes aerial and geophysical surveys, geological studies, core testing, drilling test wells, and seismic surveys. *Id.* at 565. The Fifth Circuit noted that "the purpose of geophysical operations is to determine the characteristics of underground structures, with particular reference to characteristics which are favorable to the possible presence of oil or gas." *Musser*, 201 F.3d at 566.

---

[14] XTO obtained a writ of mandamus to avoid disclosing oil and gas trade secrets. Coincidentally, in September 2008 XTO purchased Hunt Petroleum Corporation, a predecessor family business of Peregrine's owners. (Pl.'s Ex. 72)

Moreover, in *Amoco Production Co. v. Laird*, the Indiana Supreme Court held that information regarding the potential location of oil fields was entitled to trade secret protection. 622 N.E.2d 912, 920–21 (Ind. 1993). In *Laird*, Amoco used microwave radar technology to acquire oil reserve data. *Id.* at 914. An Amoco geologist, who was consulted as an expert in the technology, sent a competitor a page from a road atlas where he had indicated the location of potential reserve sites. *Id.* The competitor, Laird, then used this information to obtain oil and gas leases for a substantial portion of the reserve locations. *Id.* Amoco filed an action against Laird, seeking, in part, a preliminary injunction prohibiting Laird from pursuing or developing oil and gas leases that had been defined by the road atlas and from using or disclosing any other information gained from discovery or litigation of the case. *Id.* at 914–15. The court held that the information which related to the location of the oil reserve sites was entitled to trade secret protection. *Id.* at 920–21. The court further stated that "without the availability of [trade secret] protection, particularly with respect to exploration of subterranean natural resources, corporations and individuals would not risk the large sums of money for geophysical exploration, an expensive but only infrequently rewarding adventure." *Id.* at 921.

**B.** *Trade Secret Analysis under the Restatement's Six-Factor Test.*

After determining that information relevant to oil and gas exploration and production is frequently treated as a trade secret both in the industry and case law, the Restatement's six-factor test can be applied to determine whether TXCO's data constitute trade secrets. TXCO asserts that it possessed eleven distinct groups of information that qualify as trade secrets. While each type of information is unique, each category is utilized by oil and gas companies cumulatively for different, but intertwined, purposes. (Tr. 79, June 1, 2011 a.m.) For simplicity and clarity,

TXCO's data will be categorized in this Opinion as subsurface data, production data, and operations data.

### 1. *Subsurface Data.*

The category "subsurface data" includes any information which enables a company to determine the characteristics of a mineral formation. Specifically, subsurface information consists of core samples, seismic and microseismic data, well logs, and geologic and geographic maps. Core samples are taken by breaking up cylinders of rock at the bottom of a well during drilling operations and bringing the broken rock to the surface for analysis to reveal the geophysical characteristics of a particular mineral formation. (Tr. 110, May 31, 2011 p.m.) Companies usually take between ten and thirty feet of rock for a core sample, but sometimes up to sixty feet of rock is used. (*Id.*)

Seismic information is obtained by transmitting sound waves into the earth which reflect from various subsurface structures. By recording the waves when they reach the surface, the characteristics of an underground mineral formation can be determined. (*Id.* at 115) Microseismic data is obtained by using a relatively new technique in which a sounding source is placed in a horizontal or vertical well, and a receiver is placed into another well. (*Id.* at 115–16) By reading the sound waves at the receiver, companies can determine the location of underground fractures, the direction in which they run, and the effectiveness of fracturing operations at particular intervals. (*Id.*) Microseismic data differs from seismic information because it provides specific information on fracturing operations, whereas seismic shoots reveal the general formation characteristics under a particular tract of land. (*Id.*)

Well logs are used to determine mineral formation characteristics in a specific area of operations. (Trs. 80, June 1, 2011 a.m., 101–02, May 31, 2011 p.m.) Usually, a well generates an

electronic log that records the amount of oil and gas extracted from that well. (Tr. 80, June 1, 2011 a.m.) By looking at well logs cumulatively, a cross-section of the average mineral content can be determined. (*Id.*) Well logs are also used for calculating various decline curves which show the potential of a particular play, including resistivity, density, and porosity curves. (Tr. 101–02, 109, May 31, 2011 p.m.) In combination with core samples, well logs reveal lithology, organic content, thermal maturity, and prospectivity for oil, dry gas, and wet gas condensate within a formation. (Tr. 55–56, July 6, 2011 a.m.) There are many types of maps used in the oil and gas industry, some of which may contain confidential information such as daily production information and well log information. (*Id.* at 126–27) An isopach map typically maps one or more subsurface horizons and shows formation thickness across a broad area. (*Id.* at 127) Structure maps show how a particular formation changes over a geographic area, and are essentially topographic maps for subsurface mineral formations. (*Id.* at 128) Isopach and structure maps are created using seismic and 3D seismic data, or can be generated from well and core logs. (*Id.*)

The oil and gas industry typically treats seismic data and other methods for obtaining subsurface geological information as trade secrets. *In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003) (orig. proceeding). Operators do not publicly release detailed information on subsurface geology because it is expensive and time consuming to acquire. (Pl.'s Ex. 637; Trs. 103–04, May 31, 2011 p.m., 86–88, June 1, 2011 a.m., 36–38, July 27, 2011 p.m., 69, 73–78, 89–92, 104, Aug. 9, 2011 a.m.) Because of the relative lack of activity in the Maverick Basin prior to the land rush, TXCO, Anadarko, St. Mary, and Encana were among the few companies with substantial operations in the play prior to 2009. (Trs. 114–15, May 31, 2011 p.m., 43–45, June 7, 2011 a.m.,

28, July 1, 2011 a.m.) Therefore, these companies were among the few E&P companies with substantial subsurface data prior to the land rush.

Although Texas regulations require a well log to be filed publicly with the Texas Railroad Commission ("RRC") on every well drilled and completed, companies typically file well logs with minimal information and can obtain confidentiality on logs from new wells for up to three years because the information provides a competitive advantage in subsurface knowledge. (Tr. 69–70, 103–04, May 31, 2011 p.m.) H.C. Voorhies, a geophysicist for Espada Operating L.L.C., an E&P company, testified that "until you release a log . . . it would be private . . . ." (Tr. 109, Aug. 19, 2011 a.m.) TXCO kept its well logs and core samples confidential, but at times released limited information to apprise investors of the success of particular wells and horizons in which it was drilling. (Tr. 64, June 1, 2011 a.m.) Some subsurface data was available to TXCO's competitors through organizations such as the United States Geological Society and the Core Lab Consortium, but this information was not as valuable as TXCO's subsurface data because it consisted of limited publicly available information and data that was contributed by consortium members. (Trs. 33–34, June 3, 2011 p.m., 113–14, May 31, 2011 p.m.) Moreover, hard subsurface data such as logs and core samples are not shared outside of formal data trades. This is also true with regard to data sharing between oilfield scouts, whose job consists of gathering information on prospective trends. (Tr. 119, 121, July 7, 2011 p.m.) The lack of activity in the Maverick Basin and the confidential nature of subsurface data demonstrate that TXCO's information was not widely known outside of the business or by TXCO's competitors prior to the land rush. (Trs. 114–15, May 31, 2011 p.m., 105, Aug. 19, 2011 a.m.)

Within TXCO, subsurface data was made available only to employees who needed it in the course of their duties, which would have included management, the land department, engineers, geophysicists, and geoscientists. (Trs. 79–80, May 31, 2011 p.m., 101, June 24, 2011 a.m.) TXCO's office and file rooms were secured by a locking system that could be accessed only with a keycard. (Tr. 89, 96, July 14, 2011 a.m.) TXCO's electronic data was maintained on a password-protected computer system in categorized hard drives which were accessible only to certain employees. (*Id.*) Although an employee with access to TXCO's information could freely download data onto flash drives and work from home, all TXCO employees were under a duty to keep company information confidential in accordance with policies set forth in TXCO's employee manual, which employees were required to sign acknowledging the confidentiality of information acquired in the course of employment. (Pl.'s Ex. 437; Trs. 63–65, May 31, 2011 p.m., 72, July 6, 2011 p.m.) Further, employees were prohibited from removing TXCO's information outside of the course of their duties or giving it to a third party without management's permission. (Trs. 100–01, June 9, 2011 p.m., 105–06, June 24, 2011 a.m., 29, July 1, 2011 a.m.) When an employee was terminated, TXCO's procedure was to immediately block that person's access to company information. (Tr. 75, July 6, 2011 p.m.)

TXCO traded information with other companies, but only under the protection of a confidentiality agreement or an expectation of confidentiality. (Trs. 105–06, May 31, 2011 p.m., 140–41, June 3, 2011 p.m.) TXCO's JEAs with Anadarko and Encana provided for the mutual exchange of data and expressly required that each party maintain the confidentiality of the information it received. (Pl.'s Ex. 87; Trs. 13, June 1, 2011 a.m., 57, June 2, 2011 a.m.) Further, when TXCO began marketing its properties, it gave presentations to third parties who expressed interest in a possible transaction only *after* obtaining a signed confidentiality agreement. (Pl.'s

Ex. 1; Tr. 105–06, June 1, 2011 a.m.) Although TXCO took considerable steps to limit the extent of information received by its employees and those related to its business, TXCO did not typically require confidentiality agreements with vendors or operators it used to drill and complete wells. (Trs. 98, June 27, 2011 p.m., 92, June 8, 2011 p.m.) Vendors and drilling consultants such as Robert Patterson, however, were retained with an expectation of confidentiality and loyalty. (Tr. 141–47, 163–64, May 31, 2011 p.m.) This expectation was bolstered by state laws and rules requiring engineers to maintain the confidentiality of client information, unless the client, being fully informed, consents to disclosure. (Pl.'s Ex. 137; Tr. 17–21, June 14, 2011 p.m.) Sigmon testified that TXCO would have immediately fired a vendor or employee who was found to be violating its policies of confidentiality. (Tr. 151, May 31, 2011 p.m.)

TXCO's subsurface data was highly valuable because it revealed the characteristics of mineral formations in the Maverick Basin. Core samples and well logs are valuable to geoscientists because they reveal characteristics of underlying mineral deposits on a specific tract of land. (Trs. 22–23, June 10, 2011 a.m., 36, July 15, 2011 p.m.) Seismics and microseismics are similarly valuable because they reveal detailed information on the location and possible extraction of hydrocarbons in a focused area of operations. (Tr. 115–17, May 31, 2011 p.m.) TXCO's well logs proved to be one of the most important resources available for assessing the Eagle Ford and Pearsall formations. (Tr. 55–56, July 6, 2011 a.m.) Combined with core samples, TXCO's well logs were essential to understanding the lithology of the Maverick Basin, calculating organic content, determining thermal maturity, and assessing prospectivity for oil, dry gas, and wet gas condensate. (*Id.*) Although some well logs are publicly available, Peregrine admitted that all well logs are not the same, not all logs are filed with the RRC, and not all logs

34

are publicly available. (Tr. 84, June 30, 2011 a.m.) Peregrine also conceded that the analysis of well logs is proprietary and confidential, and that it considered its own well logs proprietary. (Pl.'s Ex. 141; Trs. 25, June 30, 2011 a.m., 36, Aug. 8, 2011 p.m.) Although structure and isopach maps are publicly available, TXCO's structure and isopach maps were far more accurate because they were formulated with TXCO's data rather than the publicly available data used to make other maps. (Tr. 33–36, 42, June 3, 2011 p.m.) TXCO's subsurface data was unique and valuable. (Tr. 53–54, July 6, 2011 a.m.)

TXCO acquired and compiled information on the Maverick Basin through a difficult, time-consuming, and expensive process of trial and error. (Trs. 93, May 31, 2011 p.m., 107, 111, June 1, 2011 p.m.) Because TXCO entered the Maverick Basin early, it gained a level of subsurface knowledge that would have required any other company to expend considerable time and effort to obtain. (Trs. 34, June 3, 2011 p.m., 101–04, May 31, 2011 p.m.) For example, a core sample can cost between $20,000 and $100,000, depending on the time it takes to bring the sample to the surface, which is a process that can take several days to complete. (Tr. 111, 113–14, May 31, 2011 p.m.) Because of the high cost, core samples are not done on every well and typically are kept confidential. (Trs. 111, May 31, 2011 p.m., 80, June 1, 2011 a.m.) Similarly, the process for gathering seismic and microseismic information is expensive, time consuming, and generally kept confidential. (Tr. 115, 163, May 31, 2011 p.m.) Well logs generally cost between $10,000 and $20,000 per well and typically are kept confidential. (*Id.* at 101–02, 109, 130) Although well log consortiums exist in which members can acquire log information, a company must pay a membership fee and information is limited to the collective knowledge of its members. (Trs. 130, May 31, 2011 p.m., 64, June 1, 2011 a.m.)

When TXCO began having financial problems, it provided other companies access to its information after the execution of a confidentiality agreement. (Tr. 111, June 1, 2011 a.m.) Other companies were prohibited from using the data to compete with TXCO's acreage position because the agreement stipulated that the receipt of confidential data was solely for the purpose of considering a potential transaction with TXCO and prohibited the signer from acquiring any of TXCO's assets for three years. (Pl.'s Ex. 1; Tr. 110–11, June 1, 2011 a.m.) Further, a company that received TXCO's information under the agreement was required to return all information it was provided if no transaction occurred with TXCO within a reasonable time. (Pl.'s Ex. 1) The agreement did not convey *ownership* of TXCO's information. Jim Sigmon testified that the only legitimate way to obtain and use the subsurface information known to TXCO would have been to buy the company, attempt to duplicate the information by spending time, money, and effort to obtain an acreage position and drill wells, or partner with TXCO. (Tr. 153–54, May 31, 2011 p.m.) In light of the foregoing, the Restatement factors weigh in favor of trade secret protection for TXCO's subsurface data.

### 2. *Production Data.*

"Production data" consists primarily of initial production ("IP"), daily, and monthly production data. IP data is the first indication of a well's performance by measuring the flow rate, pressure, and amount of oil, gas, and water produced from a newly drilled well. (Trs. 63, June 1, 2011 a.m., 21, Aug. 9, 2011 a.m., 21, Aug. 30, 2011 p.m.) Daily and monthly production data are thereafter collected based on the flow rate and pressure throughout a well's productive lifespan. Production data also includes estimated ultimate recovery ("EUR"), flowback, and pressure-volume-temperature ("PVT") data. EUR is a prediction of the total amount of hydrocarbons that can be extracted from a well. (Tr. 56–57, Aug. 9, 2011 a.m.) IP, daily, and

monthly production data are used to predict EUR, which enables a company to calculate decline curves on wells and estimate the length of time a given well will produce hydrocarbons. (*Id.*) As more production data is collected from a well, EUR becomes more accurate. (*Id.* at 23) PVT data reveals how gas in a particular well reacts under pressure and changes in volume when different pressures and temperatures are put into the formation. (Tr. 117, May 31, 2011 p.m.) Flowback reports are typically obtained by analyzing the pressure and amount of fracture fluids, hydrocarbons, and water that return to the well head after a well is fractured. (*Id.* at 119) Flowbacks provide the earliest production data obtainable from a fractured well because they give an early indication of a well's response to fracturing and its likelihood of success, as opposed to long-term production data. (*Id.* at 120)

Production data, by its nature, is not acquired until an operator has completed a well. Jim Sigmon testified that "in [an] early play you're not going to get production for months." (*Id.* at 122) A company must timely report IP and monthly production data to the RRC to avoid penalties, but there can be up to a two-month delay before the RRC publishes the data. (*Id.* at 120–21) In addition to filing production data with the RRC, oil and gas operators typically announce the completion of a well by releasing a limited amount of IP data to generate excitement and interest in the company. (Trs. 83, June 1, 2011 a.m., 30, Aug. 30, 2011 p.m.) When TXCO publicly disclosed its IP data, it limited disclosure so that the information was sufficient only to alert shareholders and the public that the company had completed a producing well. (Trs. 132, May 31, 2011 p.m., 63–64, June 1, 2011 a.m.) Daily data is valuable for generating early decline curves and is not generally available to the public. (Tr. 71, July 7, 2011 a.m.) PVT and flowback data are likewise not filed with the RRC or otherwise publicly disclosed. (Trs. 63–64, June 1, 2011 a.m., 40, June 1, 2011 p.m., 92, July 14, 2011 a.m.) TXCO

37

did not publicly release its daily production data, PVT or flowback data. (Tr. 28, 40–53, June 1, 2011 p.m.) Aside from the limited amount of production data that was publicly released or filed with the RRC, TXCO's production data was not widely known outside of TXCO. (Trs. 92, July 14, 2011 a.m., 160, May 31, 2011 p.m.)

Production data is valuable because it promotes an understanding of subsurface mineral formations by enabling a company to evaluate the effectiveness of its drilling operations. (Tr. 101–02, May 31, 2011 p.m.) As a result, production data becomes more valuable as greater amounts are accumulated. For example, Jeremy Greene testified for Peregrine that EUR could be calculated on a well based on IP data, but stated that early production data would not yield an accurate representation of the decline curve. (Trs. 21–23, Aug. 9, 2011 a.m., 72, Aug. 10, 2011 a.m.) Terry Payne, a petroleum engineer, testified that when using production data to predict mineral formation characteristics, "I'm looking for enough data from which I can make a reliable projection of what the well is going to do in the future. These shale plays are characteristic of coming on at a relatively high rate but declining very, very rapidly . . . [s]o you want a sufficient amount of production data to be able to understand what the future production characteristics are going to be." (Tr. 44, Aug. 30, 2011 p.m.) Jim Sigmon testified that greater amounts of production data yield more accurate decline curves, which provide a better projection of EUR within a field. (Tr. 45, June 1, 2011 p.m.) Sigmon also testified, however, that daily flowback data highlight the areas within a play that are particularly valuable and thus provide a competitive advantage when acquiring leases. (*Id.* at 41–42)

Because detailed production data cannot be acquired without drilling and completing a well, a substantial amount of effort and money must be expended before it can be obtained. In addition to the cost of leasing property and completing a well, operators usually hire vendors to

collect production data. For example, Jim Sigmon testified that flowback reports usually cost several thousand dollars per day because at least two employees must be on-site with equipment capable of collecting flowback data. (Tr. 139–40, May 31, 2011 p.m.) In order to collect useful flowback information on a single well, TXCO hired vendors for three to ten days. (*Id.* at 141) Production data concerning TXCO's Eagle Ford wells, including the Briscoe Catarina 1-H and the San Pedro 1-H, would have been valuable to a company in deciding whether to acquire a lease because there were no other completed horizontal Eagle Ford wells in the Maverick Basin at the time Peregrine sought to enter the play. (Tr. 57–58, June 1, 2011 a.m.)

Precautions were taken by TXCO to maintain the secrecy of its production data within and outside of its business. *See supra* Part XII.B.1. In addition to the security measures in place on its computer systems, TXCO restricted the availability of its production data on a need-to-know basis within the company. Employees were required to sign an agreement which acknowledged the duty to preserve confidential information. TXCO traded production data with a few parties without a confidentiality agreement, but it was done after both TXCO and its trading partners established acreage positions and a mutual expectation of confidentiality was in place. (Tr. 113–15, 124, June 2, 2011 a.m.) Production information was not shared with competitors unless there was a confidentiality agreement in place or an expectation of confidentiality. (Tr. 71–72, 163–64, May 31, 2011 p.m.) Furthermore, to acquire the production information known to TXCO, a company would have had to either devote substantial time, money, and effort obtaining an acreage position and drilling wells, or spend money partnering with TXCO or another company with the information. *See supra* Part XII.B.1. TXCO spent nearly $30 million to obtain ownership rights in Anadarko's production and other data on five science wells in the Maverick Basin. (Tr. 68, June 1, 2011 p.m.) Additionally, TXCO spent

nearly $32 million under its farmout with Encana to obtain Encana's production and other data. (Pl.'s Ex. 738) This money was spent by TXCO to develop its trade secrets because it had to commit to several phases of drilling operations under its farmouts with Anadarko and Encana, each of which required TXCO to pay the full costs to drill and complete each well in return for a 50% interest. (Pl.'s Exs. 86, 738; Tr. 68, June 1, 2011 p.m.) Under the Anadarko and Encana Farmouts, TXCO acquired confidential IP data, daily and monthly production data, and flowback, PVT, and EUR data that it would otherwise not have received. Although other companies were given temporary access to TXCO's production data, there was an underlying confidentiality agreement that restricted using the data for any purpose other than evaluating a transaction with TXCO and mandated the return of all TXCO information. (Pl.'s Ex. 1; Tr. 110–11, June 1, 2011 a.m.) Under these facts, the Restatement's six-factor test is satisfied as to TXCO's production data.

### 3. *Operations Data*.

"Operations data" includes a company's land and lease files, drilling schedules, farmouts and JEAs with other companies, authorizations for expenditure ("AFE"), and fracturing designs. Land and lease files contain all information about an oil and gas lease, including a summary and general terms of the lease, the location and number of acres, royalty burdens, and drilling schedules. (Tr. 88–89, July 14, 2011 a.m.) Land and lease files reveal a company's acreage position, lease expiration dates, drilling requirements, and renewal measures. (*Id.* at 89) Typically, a farmout or JEA contains lease-specific information about lessors, leased acreage, terms, drilling schedules, and requirements to extend leases. (*Id.*) Farmouts and JEAs reveal a strategy for mutual development because they describe lands and leases subject to the agreement and determine how wells are drilled and costs are shared between operating partners. (Trs. 106,

May 31, 2011 p.m., 38, June 1, 2011 a.m.) AFEs are detailed cost estimates that are necessary to accurately predict the economics of drilling operations. (Trs. 123, May 31, 2011 p.m., 58, June 2, 2011 a.m.) A company will usually formulate AFEs and conduct economic analyses for drilling, completing, and fracturing wells. (Tr. 123, May 31, 2011 p.m.) Fracturing designs are essentially recipes for fracturing wells, which include information such as the type of liquid and proppant used in a particular stage, as well as the rate and amount of pressure. (*Id.* at 117–18)

Operations data represents the acquired knowledge and strategies a company uses to guide its business decisions. In a developing resource play, smaller companies such as TXCO try to enter early to test their strategies and obtain enough success to attract a bigger operating partner to jointly develop the play. (Tr. 119, May 31, 2011 p.m.) When TXCO entered the Maverick Basin, there were few operators in the play and no production from the Eagle Ford or Pearsall formations. (*Id.* at 131) Before the 2009 land rush occurred, many in the oil and gas industry doubted that there were economically recoverable hydrocarbons in the Eagle Ford.[15] (Trs. 131–32, May 31, 2011 p.m., 28, July 1, 2011 a.m.) Due to the lack of leasing and drilling activity prior to 2009, few other operators had acquired operations data of the nature and extent accumulated by TXCO.

Some operations data was publicly available to others in the E&P business. Oil and gas operators in the Maverick Basin generally knew the identity of landowners, the location and extent of their property, and the general acreage positions of other operators in the area. (Pl.'s Ex. 113) Additionally, companies are required to file records with the county in which they drill designating pooled units and the acreage on which they are located. Those filings provide an idea of a company's acreage position and the extent of its drilling operations. (Tr. 35, July 1, 2011

---

[15] Jim Sigmon testified to the effect that in past years he was told that dinosaurs may have passed through Maverick County, but none died there. (Tr. 132, May 31, 2011 p.m.)

a.m.) Hydraulic fracturing designs are commonly disclosed; however, detailed results from fracturing operations are usually not made available. (Tr. 72, June 6, 2011 p.m.) Well costs are often generally disclosed in investor material because they are an important factor in determining whether to invest. (Tr. 35, Aug. 30, 2011 a.m.) In August 2008, TXCO disclosed that Pearsall wells cost about five million dollars to drill and complete. (Tr. 117–18, Aug. 8, 2011 p.m.) Similarly, in January 2009, Petrohawk announced Eagle Ford well costs of five to six million dollars. (*Id.* at 129) TXCO's vendors had access to a substantial amount of TXCO's operations data, including AFEs, fracturing designs, and drilling schedules, because it was necessary to perform their duties. Service providers that were hired to conduct drilling and fracturing operations at well sites were typically not bound by confidentiality agreements, but were hired under an expectation of loyalty and confidentiality. (Trs. 145–48, May 31, 2011 p.m., 79–80, June 6, 2011 a.m.) While general information on fracking designs and drilling operations are commonly shared between vendors in the oil and gas industry, detailed operations data are not shared outside of a JEA because that information would enable competitors to analyze the economics of a potential lease. (Trs. 57–60, 74–75, 80–81, June 2, 2011 a.m., 78, June 6, 2011 a.m.) Although some of TXCO's operations data was available publicly, AFEs, farmouts and JEAs, hydraulic fracturing results, and land and lease files were kept confidential because they contained detailed information about leases, well sites, drilling and completion costs, and drilling and leasing strategies. Other than general information that was known to the industry, TXCO's operations data was not known to others in its business outside of information it shared under JEAs with Anadarko, Encana, and St. Mary.

TXCO's operations data was valuable to its business and its competitors because it was difficult and expensive to acquire. Sigmon testified that "it was very difficult . . . [and] time

consuming for us . . . there's just no place to get it." (Tr. 48, June 2, 2011 p.m.) Land and lease files are valuable because they reveal a company's business strategy through its acreage position, lease expiration dates, drilling requirements, and renewal measures. (Tr. 89, July 14, 2011 a.m.) Likewise, farmouts and JEAs are valuable because they contain detailed leasehold information, drilling requirements and plans, cost sharing provisions, and plans for joint operations within a given area of operations. (Pl.'s Ex. 86; Tr. 106, May 31, 2011 p.m.) In addition to the value this data would provide to a company's overall business strategy, TXCO's JEAs with Anadarko or Encana would have provided an advantage in negotiating joint development arrangements with other operators. (Pl.'s Ex. 86; Tr. 48–49, June 1, 2011 a.m.) TXCO's AFEs would have been particularly valuable to anyone active in the Maverick Basin because they contained the costs for TXCO's horizontal drilling completion procedures and fracturing operations. (Tr. 93–94, July 14, 2011 a.m.) All of this information would have provided a competitive advantage to another operator in negotiating leases, acquiring leases, and drilling wells. (Pl.'s Ex. 86; Trs. 93–94, July 14, 2011 a.m., 48, June 1, 2011 a.m., 72, June 6, 2011 p.m.) A company with TXCO's operations data would have "a window into the strategy of the company and where it plans to develop, which direction, what part of [the] play, [and] where it's going to spend its capital." (Tr. 92, July 14, 2011 a.m.)

TXCO took measures to protect the secrecy of its information. *See supra* Part XII.B.1. TXCO's operations data was only available to employees on a need-to-know basis and stored on password-protected computer systems. Further, TXCO's office and file rooms were secured by a locking system that could accessed only with a keycard. Employees were bound to confidentiality and not permitted to disclose TXCO's information to third parties unless there was a confidentiality agreement in place or disclosure was authorized by Sigmon himself. (Pl.'s

43

Ex. 437; Tr. 98–99, July 14, 2011 a.m.) Moreover, TXCO expended a considerable amount of resources to develop its operations data because it was acquired by conducting drilling operations under its partnerships with Anadarko and Encana. (Tr. 49–60, 72–77, 111, June 1, 2011 a.m.) To properly acquire TXCO's operations data, a company would have had to enter into a JEA with TXCO, Encana or Anadarko, or otherwise purchase the information. Duplication of TXCO's operations data would have required a company to learn by experience from its own leasing and drilling operations. *See supra* Part XII.B.1. Accordingly, the Restatement's six-factor test weighs in favor of trade secret status for TXCO's operations data.

### C. *Breach of a Confidential Relationship or Improper Discovery of a Trade Secret.*

Texas courts condemn the employment of improper means to procure trade secrets. *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). To satisfy the second element of a trade secret misappropriation claim, the plaintiff must prove that: (1) the defendant discovered the secret by improper means; or (2) the defendant's disclosure and use, after properly acquiring knowledge of the secret, constituted a breach of the confidence reposed in the defendant. *Vinmar*, 231 S.W.3d at 424. The Fifth Circuit has stated that "it is not improper to obtain knowledge of a process where the holder of the alleged trade secret voluntarily discloses it or fails to take reasonable precautions to ensure its secrecy." *Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994). A trade secret is not destroyed by disclosure, however, if the owner "creates a duty in some manner and places that duty upon another not to disclose or use the secret." *Phillips*, 20 F.3d at 630; *see also* *Furr's Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. Civ. App.—El Paso 1964, writ ref'd n.r.e.) (owner of trade secret must establish confidential relationship with other party, by contract or otherwise, or secret will be lost by disclosure), *cert. denied*, 382 U.S. 824 (1965); *Hyde Corp. v. Huffines*, 314

S.W.2d 763, 777 (Tex. 1958) (express agreement not necessary where actions of parties and nature of relationship, taken as a whole, establish existence of a confidential relationship), *cert. denied*, 358 U.S. 898 (1958).

By creating a duty upon the disclosee, the discloser takes a reasonable precaution to secure the information's secrecy, and the resulting voluntary disclosure is "made within the periphery of a confidential relationship that eliminates the need to take further precautions to secure the trade secret." ***Phillips***, 20 F.3d at 630–31. An injured party is not "denied relief where the offending party originally entered into the relationship without an improper motive." ***Id.*** at 631. Rather, "[o]ne who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if . . . his disclosure or use constitutes a breach of the confidence reposed in him by the other in disclosing the secret to him." ***Metallurgical Indus. Inc. v. Fourtek, Inc.***, 790 F.2d 1195, 1203 (5th Cir. 1986) (quoting ***Huffines***, 314 S.W.2d at 769).

Peregrine obtained a substantial amount of TXCO's trade secrets through its meetings with TXCO in early 2009. The Confidentiality Agreement signed on February 26, 2009 enabled Peregrine to receive TXCO's trade secret data "in connection with [Peregrine's] consideration of a possible transaction with [TXCO]." (Pl.'s Ex. 1) The CA imposed an obligation of confidentiality on Peregrine concerning Evaluation Material, which is defined in the agreement as "any information concerning [TXCO] (whether prepared by [TXCO], its advisors or otherwise) which is furnished to [Peregrine] by or on behalf of [TXCO]." (***Id.***) Peregrine understood that Evaluation Material included information possessed by TXCO that was not generally available to the public, and information from third-party sources that were under an obligation of confidentiality to TXCO. (Tr. 18–19, June 29, 2011 p.m.) The CA contemplated that Peregrine's receipt of Evaluation Material was "solely for the purpose of evaluating a

possible transaction between [TXCO] and [Peregrine]." (Pl.'s Ex. 1) Peregrine further agreed not to acquire any of TXCO's assets for a period of three years from the date of the agreement. (*Id.*) In addition, if Peregrine did not enter into a transaction with TXCO, it was required to return "all written Evaluation Material and any other written material containing or reflecting any information in the Evaluation Material." (*Id.*) Peregrine was also required to destroy any copies, extracts, or reproductions of Evaluation Material, and any writings based on information in the Evaluation Material. (*Id.*)

Peregrine received and took notes on a wealth of information in a 186-slide Management Presentation given by Sigmon and Grinsfelder on March 5, 2009 ("First Meeting"). (Tr. 93, July 15, 2011 a.m.) At the meeting, TXCO gave Peregrine a flash drive or digital version of the Management Presentation. (Pl.'s Ex. 511; Tr. 92, July 15, 2011 a.m.) The presentation contained microseismic data, fracturing results, daily production data, decline curves, flowback reports, structure and isopach maps, core data, and well logs and their interpretations. (Tr. 7–84, June 1, 2011 p.m.) During the First Meeting Peregrine also learned that TXCO's leases covering the BLS Acreage had either expired or would expire without further drilling operations, and that TXCO's lease on the Cage Acreage might expire unless another well was drilled. (Pl.'s Ex. 392; Trs. 122, June 28, 2011 p.m., 71–73, July 8, 2011 a.m.) According to representatives from Peregrine, the company saw no possibility of reaching a deal with TXCO after the First Meeting. (Trs. 29–31, July 8, 2011 a.m., 98–99, July 15, 2011 a.m.)

Despite its disinterest, Peregrine scheduled another meeting on March 13, 2009, where Peregrine's technical team met with TXCO for a "deep technical dive" in a series of one-on-one meetings (the "Second Meeting"). (Pl.'s Ex. 206) Before the Second Meeting, Peregrine sent TXCO emails indicating its interest in TXCO's assets and requested specific information. (Pl.'s

46

Exs. 310, 142, 25) In the course of the one-on-one meetings between Peregrine and TXCO employees, Peregrine reviewed subsurface data and received a detailed analysis of TXCO's Eagle Ford drilling program that included production and operations data. (Pl.'s Ex. 218; Tr. 204, 216, June 28, 2011 p.m.) Gary Grinsfelder provided an updated version of the Management Presentation containing 199 slides, and Steve Young, TXCO's chief Eagle Ford geoscientist, gave a presentation regarding the Eagle Ford and Pearsall formations. (Pl.'s Ex. 24; Tr. 92, July 15, 2011 a.m.) Peregrine left the Second Meeting with a digital copy of Young's presentation, which was entitled "Architecting the Unconventional: An Early-Mover Opportunity in the Rapidly Emerging Eagle Ford Shale Gas Resource Play." (Pl.'s Exs. 211, 221; Tr. 186–87, June 28, 2011 p.m.) According to Peregrine, there was no need to follow up with TXCO after the Second Meeting because the companies were not going to reach a deal. (Tr. 35, July 15, 2011 p.m.)

After the Second Meeting, however, Peregrine requested and received additional TXCO information, including daily production data, core data, detailed fracturing designs, PVT analyses, structure and isopach maps, and leasehold information. (Pl.'s Ex. 26; Trs. 93–94, 101–04, 125–31, June 1, 2011 p.m., 106–08, June 24, 2011 a.m.) Although some information received by Peregrine was publicly available, the majority of the information obtained by Peregrine constituted Evaluation Material. (*Id.*) Peregrine acknowledged that it received daily production data, AFEs, TXCO's JEAs with Anadarko and Encana, a lease exploration report for Anadarko, core data, a detailed fracturing design, logs on five Anadarko science wells, PVT data, and a map showing TXCO's well locations. (Def.'s Ex. 652; Trs. 115, 135–41, July 15, 2011 a.m., 50–60, 79, 83–90, July 15, 2011 p.m.) Despite meeting twice with TXCO and acquiring a substantial amount of TXCO's trade secret information, Peregrine did not proceed with a transaction.

The Confidentiality Agreement was the best reasonable precaution TXCO could have taken to ensure that another company would not publish or use its information. At the time TXCO provided its trade secrets to Peregrine, TXCO believed that Peregrine would use TXCO's trade secrets solely for the purpose of evaluating a mutually beneficial transaction, which Peregrine confirmed by executing the CA. Peregrine was aware of TXCO's strained financial condition and knew that TXCO needed an operating partner in order to save its oil and gas leases. As a newly formed E&P company with no prior experience in the Maverick Basin, Peregrine also knew that the Evaluation Material was highly valuable, which was demonstrated by Peregrine's continuous efforts to acquire TXCO's trade secrets while the companies were in negotiations and thereafter.

The data gave Peregrine a clear picture of TXCO's cumulative experience in the Maverick Basin, which TXCO acquired by its own operations and those under its JEAs with Anadarko and Encana. Peregrine would have been unable to acquire that data elsewhere except through Peregrine's own efforts to independently develop the data by conducting operations or undertaking joint operations with another company. Peregrine's acquisition of the information was not initially wrongful, but Peregrine's conduct became wrongful when it used TXCO's trade secrets to acquire oil and gas leases formerly held by TXCO, or in close proximity, outside of any transaction with TXCO. The disclosed material gave Peregrine a competitive advantage over TXCO and other competitors in negotiations on the BLS Acreage. In light of the circumstances surrounding the execution of the CA and the nature and scope of information Peregrine received, TXCO reposed its confidence in Peregrine to abide by the CA and refrain from using TXCO's trade secrets for its own benefit. Not only did Peregrine breach the CA, but Peregrine's conduct

surrounding its acquisition and use of TXCO's trade secrets constituted a breach of the confidence placed in Peregrine to refrain from using TXCO's trade secrets adversely to TXCO.

In addition to receiving confidential and trade secret information directly from TXCO under the CA, Peregrine received TXCO's trade secrets by improper means through Jeff Bookout after he was terminated from TXCO. Under Texas law, an employee owes a duty to his employer extending beyond the employment relationship not to use confidential or trade secret information acquired during the employment relationship in a manner adverse to the employer. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex. App.— Houston [1st Dist.] 1998, pet. dism'd). "Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment." *Id.* at 22. Liability may be imposed not only on those who wrongfully misappropriate trade secrets by a breach of confidence, but also on others who might benefit from the breach:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if . . . he learned the secret from a third person with notice of the facts that it was a secret and that the third person's disclosure of it was otherwise a breach of his duty to the other . . . .

*Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1204 (5th Cir. 1986) (quoting RESTATEMENT OF TORTS § 757 (1939)).

On May 15, 2009, about one week after being fired from TXCO, Bookout persuaded his former subordinate, Sherry Fletcher, to send him PVT studies TXCO performed on the San Pedro 1-H and Briscoe Catarina 1-H wells. Bookout then provided that information to Peregrine in violation of the separation agreement he executed in which he pledged a continuing duty of loyalty to TXCO. (Pl.'s Ex. 154; Trs. 117, June 7, 2011 a.m., 15–19, June 2, 2011 a.m.) On May 19, 2009, Bookout sent Jeremy Greene an email containing detailed fracturing information and

daily production data from TXCO. (Pl.'s Ex. 37) Between June 5, 2009 and June 11, 2009,

Bookout sent Bill Bishop a TXCO AFE and detailed results of fracturing operations on the

Anadarko science wells. (Pl.'s Ex. 128) Further, on June 15, 2009, Bookout sent Tammy Gannon

decline curves developed by Anadarko and TXCO and forwarded a post-fracturing report on an

Anadarko well. (Pl.'s Ex. 160) On July 6, 2009, the following exchange occurred after Jeremy

Greene sent an email to Bookout requesting digital well log production data:

| | |
|---|---|
| [Greene]: | Jeff, do you have any digital well data in the general area for Cage and Hamilton? We would like to perform a NUTEC log analysis on both the EF and Pearsall[.] |
| [Bookout]: | I have 2 or 3 wells near the Hamilton. I will have to copy them to a flash drive and forward to you. Files are too big. What logs r u [sic] looking for? Triple combo, sonic or all I have? |
| [Greene]: | All is better [sic], but those with Porosity[.] |
| [Bookout]: | I can handle it. But don't ask me where I got it. |
| [Greene]: | [R]oger[.] |
| [Bookout]: | I will have ur [sic] data downloaded this weekend. |

(Pl.'s Ex. 215)

Bookout followed up by sending Peregrine a 4-gigabyte flash drive (the "Flash Drive")

containing a thorough compilation of all TXCO's data available on the five Anadarko science

wells. (Pl.'s Ex. 748; Tr. 19–20, July 7, 2011 p.m.) Peregrine admitted that the company

accessed the Flash Drive and conceded that, at a minimum, it had looked at a well log on the

Pearsall and the Eagle Ford. (Trs. 148–49, June 28, 2011 p.m., 120–21, July 8, 2011 p.m.)

Additionally, Peregrine's documents produced at trial showed that Peregrine utilized more data

from the Flash Drive than it admitted. (Pl.'s Ex. 430; Trs. 95–99, June 30, 2011 a.m., 90–95, July

26, 2011 a.m.)

Peregrine knew that Bookout was a former TXCO employee because he was present

when Peregrine employees met with TXCO employees at the First Meeting and Second Meeting.

Peregrine knew that Bookout was no longer employed by TXCO, which was admitted by Larry

50

Miller and evident from Bookout's efforts to shop the Redemption Farmout to Peregrine after he was terminated. (Pl.'s Ex. 162; Tr. 124, June 29, 2011 a.m.) In fact, Bookout attended meetings between Peregrine and the BLS Owners on *Peregrine's* behalf on July 1, 2009. (Pl.'s Exs. 72, 73; Tr. 5–7, June 8, 2011 a.m.) Moreover, the email exchange between Bookout and Jeremy Greene on July 6, 2009 evidences that Peregrine was aware of the improper nature of Bookout's conduct. (Pl.'s Ex. 215) Peregrine was also aware of its obligation under the CA not to use any of TXCO's data outside of a transaction with TXCO, including information received from a source known by Peregrine to be bound by a confidentiality agreement or other obligation of secrecy to TXCO. (Pl.'s Ex. 1) Peregrine knew that the information it received from Bookout belonged to TXCO. In light of the foregoing, Peregrine's acquisition of TXCO's trade secrets from Bookout constituted the discovery of trade secrets by improper means.

Peregrine also received confidential and trade secret information from Robert Patterson, which Patterson obtained from several of TXCO's employees, including Lelan Anders, Craig Cobb, and Greg Cooper. (Pl.'s Exs. 177, 276, 282; Tr. 103–05, 117–18 June 2, 2011 a.m.) Patterson requested and received information from those employees and deliberately avoided informing TXCO's management of his relationship with Peregrine. On September 11, 2009, Patterson forwarded flowback reports from a well close to the Hamilton Ranch to Bill Bishop and Jeremy Greene, requesting that they "[p]lease keep in house only." (Pl.'s Exs. 48, 546) On September 25, 2009, Patterson emailed Anders to request AFEs from TXCO and Anadarko on horizontal wells in the Georgetown, Eagle Ford, and Pearsall plays. (Pl.'s Ex. 275) In that email, Patterson suggested that the information "may be worth an AXIS!!!!!!!!!!!!!!!!!!!!"[16] (*Id.*) On

---

[16] In the South Texas oil business, hunting is a common activity. An Axis is an exotic deer that is hunted on many Texas ranches. According to Patterson, the right to kill an Axis deer on a ranch can cost a hunter as much as $3,500. Ultimately, Patterson got his information and Anders got his Axis. (Tr. 134, June 13, 2011 p.m.)

November 2, 2009, Patterson requested "additional production or flowback volumes on any of the Eagle Ford wells," to which Anders responded by sending TXCO production data, instructing Patterson to "[s]ee attached you didn't get it from me." (Pl.'s Ex. 203)

Patterson admitted at trial that he never asked Sigmon for permission to hire TXCO employees and never told Sigmon anything about the data and information he sought from TXCO employees. (Trs. 24–25, June 13, 2011 a.m., 99–100, 123, 126 June 13, 2011 p.m., 88, June 14, 2011 a.m., 20–21, June 14, 2011 p.m.) Anders, Cobb, and Cooper had no authority from TXCO to give this information to Patterson, and Patterson acted in violation of his duties of confidentiality to TXCO when he provided it to Peregrine. (Trs. 150–51, May 31, 2011 p.m., 117–19, June 2, 2011 a.m., 114–15, June 13, 2011 p.m.) At the time he was providing information to Patterson, Anders knew that his actions were inappropriate. (Pl.'s Exs. 273, 276, 283; Tr. 112–14, 133, 157, 159, June 6, 2011 p.m.) Anders testified that in hindsight, his disclosures were not "the right thing to do" and might have been unethical. (Tr. 113–14, June 6, 2011 p.m.) Moreover, Peregrine knew Patterson was providing TXCO's information because the emails Patterson forwarded to Peregrine concerned TXCO's wells and showed that they were sent directly from TXCO employees. (Pl.'s Exs. 540, 171, 231) Anders advised that flowback reports he sent to Patterson were "tight hole information,"[17] which Anders sent from his personal email account because his TXCO email account was "too easy to check." (Pl.'s Ex. 60) Patterson forwarded that email to Peregrine on October 16, 2009, with Anders's comments included. (**Id.**) Peregrine's recognition of the value of the information that Robert Patterson provided is apparent by its repeated efforts to solicit information and thank him when it was received.[18] (Pl.'s Exs. 58, 93, 156, 174, 551, 555; Tr. 107–08, June 13, 2011 p.m.) By requesting and receiving TXCO's

---

[17] "Tight hole information" is oil field slang for confidential information.

[18] "Thanks bunches." (Pl.'s Ex. 174)

trade secrets through Patterson and TXCO employees, Peregrine obtained TXCO's trade secrets by improper means.

### D.  *Use of a Trade Secret.*

The Fifth Circuit has recently relied on the Restatement test to determine what constitutes the "use" of a trade secret in a claim for misappropriation of trade secrets:

> Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitutes a "use."

*Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012) (quoting *Gen. Universal Sys. v. HAL, Inc.*, 500 F.3d 444, 450 n.4 (5th Cir. 2007) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (1995)) (interpreting Texas law).

Under this broad definition of "use," TXCO was required to show that Peregrine used TXCO's trade secrets in a way that was likely to result in injury to TXCO or enrichment to Peregrine. *See id.* at 279. Peregrine argued that it did not use any of TXCO's information in its decision to lease the Hamilton Ranch or the BLS Acreage, relying instead on publicly available information and a study it commissioned from NuTech Energy Alliance ("NuTech").[19] (Tr. 53–55, July 26, 2011 a.m.) Despite Peregrine's purported reliance on public information and the NuTech study, the evidence revealed that Peregrine used TXCO's trade secrets and confidential information in its leasing decisions.

Peregrine acknowledged that it used information received from TXCO in presentations that were collaboratively authored by Peregrine employees, presented to Peregrine's President,

---

[19] NuTech is a company that does proprietary well log evaluation by taking conventional well logs and performing advanced calculations to identify potential mineral deposits within a given area. (Tr. 65–66, July 28, 2011 a.m.)

Michael Wisenbaker, and ultimately relied upon by Peregrine to make its leasing decisions on the Hamilton Ranch and BLS Acreage. (Trs. 96–97, June 29, 2011 a.m., 81–108, June 29, 2011 p.m.) The presentations incorporated information taken directly from TXCO's materials and did not include a detailed discussion of any wells other than TXCO wells. (Pl.'s Ex. 398; Trs. 96–144, June 29, 2011 a.m., 81–108, June 29, 2011 p.m.) Larry Miller conceded that he used TXCO materials to prepare his portion of the presentations and specifically acknowledged that Peregrine received an isopach map, well log, and IP data from TXCO under the CA that were used by Peregrine in the presentations. (Pl.'s Ex. 398; Trs. 170–73, June 28, 2011 p.m., 81–108, 120 June 29, 2011 p.m.) Jeremy Greene similarly acknowledged using slides, maps, daily production data, operations data, core sample data, and other information received from TXCO in the presentations to Wisenbaker. (Trs. 52, July 15, 2011 p.m., 54, July 25, 2011 a.m., 8, 15–17, 35, 48, 126, 131, 137, July 25, 2011 p.m.) In fact, Greene testified that he "used what was expedient. Probably what was expedient and along with all the other . . . files that we had available." (Tr. 131, July 25, 2011 p.m.) Additionally, Peregrine admitted that it used TXCO's Eagle Ford cross-section created from logs from the Anadarko science wells in order to analyze the properties of the Eagle Ford play across the Maverick Basin. (Pl.'s Exs. 382, 383; Trs. 33–38, July 25, 2011 a.m., 185, June 28, 2011 p.m.) None of those logs were publicly available at the time Peregrine used the information. (Tr. 33–38, July 25, 2011 a.m.) Peregrine's use of TXCO's information is also demonstrated by internal Peregrine memoranda that made no mention of NuTech, but instead cited information on the horizontal wells by TXCO and Anadarko as justifying the commerciality of the play. (Pl.'s Ex. 46; Tr. 30–31, July 7, 2011 p.m.)

Peregrine's repeated requests for subsurface, production, and operations data from Bookout, Patterson, and TXCO employees highlight Peregrine's use of TXCO's trade secrets.

(Pl.'s Ex. 56; Tr. 96–97, June 2, 2011 a.m.) Before meeting with TXCO in 2009, Peregrine was a new company with no acreage position in the Maverick Basin. (Tr. 137, June 1, 2011 a.m.) When TXCO began to shop its assets in early 2009, about thirty companies signed confidentiality agreements. (Tr. 109, June 1, 2011 a.m.) Other than Newfield and Anadarko, Peregrine was the only one that had three meetings with TXCO and continued to request data thereafter. (*Id.* at 119) No other companies under a confidentiality agreement obtained leases within TXCO's acreage position, except for Newfield and Anadarko, who did so by purchasing TXCO's assets through bankruptcy. (*Id.*) Peregrine's use of TXCO's trade secrets was adverse to TXCO because TXCO was denied the competitive advantage its data provided. Peregrine's use of the data provided it with the accumulated knowledge of an E&P company experienced in the Maverick Basin. Moreover, Peregrine benefitted because it used the data without having to spend money and could not have legitimately obtained and used the data except by conducting joint operations with TXCO or another company or by its own efforts. The third element of TXCO's trade secret misappropriation claim is satisfied.

### E. *Damages*.

In any claim for trade secret misappropriation, the calculation of damages requires a flexible and imaginative approach. ***Univ. Computing Co. v. Lykes-Youngstown Corp.***, 504 F.2d 518, 538 (5th Cir. 1974) (applying Georgia law).[20] Because each case is controlled by its own peculiar facts and circumstances, damages must be calculated "to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and

---

[20] ***University Computing*** was decided under the Georgia law of trade secrets. The factors originally articulated in the Restatement of Torts § 757 (1939) are the foundation for both Georgia and Texas state law on trade secrets. Additionally, at least one Texas appellate court has relied on ***University Computing***. *See* ***Garth v. Staktek Corp.***, 876 S.W.2d 545, 548 (Tex. App.—Austin 1994, writ dism'd w.o.j.).

extent of the use to which the defendant put the trade secret after misappropriation." ***Univ. Computing***, 504 F.2d at 538. As discussed below, although TXCO has not proven its entitlement to damages based upon the Encana penalty[21] or lost profits, it is entitled to recover reasonable royalty damages.

### 1.  *Damages Measured by TXCO's Loss*.

In a claim for trade secret misappropriation, a plaintiff may recover actual damages based on the value of what has been lost by the plaintiff. *See **Univ. Computing***, 504 F.2d at 535–36. The value of what has been lost by the plaintiff is usually measured by lost profits. ***Carbo Ceramics, Inc. v. Keefe***, 166 F. App'x 714, 722 (5th Cir. 2006) (unpublished); ***Elcor Chem. Corp. v. Agri-Sul, Inc.***, 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.).

### a. *TXCO Failed to Prove Peregrine Proximately Caused a Specific Injury*.

In order to recover actual damages, TXCO was first required to show that Peregrine's use of TXCO's trade secrets proximately caused TXCO to suffer a specific injury. Proximate cause consists of two elements: (1) foreseeability, and (2) cause in fact. ***McClure v. Allied Stores of Tex., Inc.***, 608 S.W.2d 901, 903 (Tex. 1980). Both elements must be present. ***Id.*** Foreseeability is satisfied by showing that the actor should have anticipated damage to others by his wrongful act. ***Id.*** To establish cause in fact, a party must show "that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred." ***Id.*** "Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force." ***Id.*** "There need not, however, be direct and positive proof, as the [fact finder] may infer proximate cause 'from the circumstances surrounding the

---

[21] *See supra* note 4.

event.'" ***Mosley v. Excel Corp.***, 109 F.3d 1006, 1009 (5th Cir. 1997) (quoting ***B. M. & R. Interests v. Snyder***, 453 S.W.2d 360, 363 (Tex. Civ. App.—Tyler 1970, writ ref'd n.r.e.)).

TXCO averred that Peregrine's use of TXCO's trade secrets prevented TXCO from obtaining new leases on the BLS Acreage or the Hamilton Ranch and triggered the $150 per acre penalty under the Encana Farmout. TXCO is not entitled to damages for the Encana penalty or lost profits because the evidence failed to establish that, in the absence of Peregrine's use of TXCO's data, TXCO would have held its remaining leases, reacquired the BLS Acreage, or obtained the Hamilton lease. In late 2008 and early 2009, the market prices of oil and gas declined and TXCO found itself overextended on its drilling commitments, which caused it to suffer financial distress and enter bankruptcy. The lack of available funding for continuous drilling operations caused TXCO to need a joint operating partner to satisfy its drilling commitments in order to maintain its leases. In turn, the lack of a third party that was ready, willing, and able to do a deal caused TXCO to lose its leasehold interest in the BLS Acreage and incur the Encana penalty. This injury would have occurred regardless of Peregrine's conduct.

Likewise, even in the absence of any wrongdoing by Peregrine, TXCO would have been unable to reacquire the BLS Acreage, acquire the Hamilton Ranch, and obtain profits. Several BLS Owners testified that they were unsatisfied with TXCO's performance under the prior lease, concerned with TXCO's financial situation, and would not have executed a new lease to TXCO. *See infra* Part XIII. In fact, the evidence showed that TXCO was unsuccessful in its efforts to engage the BLS Owners in meaningful negotiations. Moreover, there was no evidence that TXCO would have been financially able to conduct the drilling operations necessary to obtain a profit if TXCO had obtained new leases on the BLS Acreage. With respect to the Hamilton lease, Sigmon testified that he had never been willing to pay what Hamilton asked and had no money

to lease from him. Other smaller leases obtained by Peregrine were not in the realm of possibility for TXCO to obtain. TXCO failed to show that Peregrine's misappropriation and use of TXCO's trade secrets was "a substantial factor in bringing about the injury and without which no harm would have occurred." *McClure*, 608 S.W.2d at 903. If TXCO had succeeded in establishing that a third party was ready, willing, and able to assume TXCO's drilling obligations, and that it would have reacquired the BLS Acreage, TXCO's evidence on proximate causation would be more compelling; however, neither circumstance was present. Accordingly, TXCO failed to show that Peregrine proximately caused damages for the Encana penalty or lost profits.

### b. *TXCO Failed to Prove Lost Profits*.

TXCO also failed to satisfactorily prove lost profits. To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "Although the uncertainty of damages is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damages must be shown." *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). "There can be no recovery for damages which are speculative or conjectural." *Id.* Rather, damages must be ascertainable "by reference to some fairly definite standard, established experience, or direct inference from known facts." *Id.*

Paul Szatkowski, a well-qualified expert on damages, presented extensive testimony regarding TXCO's lost profits based on the value of recoverable hydrocarbons on the BLS Acreage. Szatkowski admitted, however, that his estimate of revenues could differ significantly from the actual revenues that might be recovered. (Tr. 84, July 7, 2011 p.m.) He further acknowledged that the quantities of hydrocarbons actually developed on the BLS Acreage could

differ significantly from the estimates upon which his report was based. (*Id.* at 85) Furthermore, Szatkowski agreed that there was no certainty that it would even be *commercially viable* to produce any portion of the hydrocarbons upon which his estimation of profits relied. (*Id.* at 86, 88) Don Charbula, another well-qualified expert on damages, similarly acknowledged that his report was subject to the uncertainty that any amount of hydrocarbons would be recovered from the BLS Acreage, and was based on the assumption that it would be commercially viable to produce the reserves evaluated in his report. (Tr. 47–48, 52, July 13, 2011 a.m.) At the time of trial, *none* of the wells were "economic." TXCO's contingent estimations were insufficient to establish lost profits with a reasonable degree of certainty. *See A.B.F. Freight*, 798 S.W.2d at 615. Accordingly, TXCO failed to prove lost profits as a result of Peregrine's misappropriation of its trade secrets.

### c. *Lost Profits are an Inappropriate Measure of Damages.*

Even if TXCO had shown that Peregrine's misappropriation caused TXCO lost profits, an award of damages for lost profits would not be appropriate. While conceptually damages based on lost profits would be a proper measure for what was lost by the plaintiff, "in most cases the defendant has utilized the secret to his advantage with no obvious effect on the plaintiff save for the relative differences in their subsequent competitive positions." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974). As a result, "the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret." *Id.* Thus, "[w]here the plaintiff retains the use of the secret . . . and when there has been no effective disclosure of the secret by publication[,] the total value of the secret to the plaintiff is an inappropriate measure." *Id.* Further, unless the plaintiff can prove some specific injury, such as lost sales, "the loss to the plaintiff is not particularly helpful in

assessing damages." *Id.* at 536. In this case, the value of TXCO's trade secrets was not destroyed because TXCO retained the possession and use of its trade secrets at all times and Peregrine did not publicly disclose the information it received. Peregrine wrongfully used the data to its benefit with no specific injury to TXCO, "save for the relative differences in their subsequent competitive positions." *Id.* at 535. Because the value of TXCO's trade secrets was not destroyed, an award of damages based on TXCO's estimates of its lost profits is not appropriate.

### 2. *Damages Measured by Reasonable Royalty*.

Where a trade secret has not been destroyed and the plaintiff is unable to prove a specific injury, the accepted approach to damages measures the value of the misappropriated trade secrets *to the defendant*. **Univ. Computing**, 504 F.2d at 536 (emphasis added). Thus, the technique for assessing the value of TXCO's trade secrets to Peregrine is properly measured by the benefits, profits, or advantages gained by Peregrine through the use of TXCO's trade secrets. *See id.* Normally only the defendant's proven actual profits can be used as a measure of damages, and the defendant is not assessed damages on "wholly speculative expectations of profits." *Id.* The evidence showed that Peregrine has not obtained any profits in its drilling operations in the Maverick Basin. Because Peregrine has not been successful in economically producing hydrocarbons on the leases it acquired by using TXCO's trade secrets, no actual profits exist by which to value the worth to Peregrine of the information it misappropriated.

The Fifth Circuit has held, however, that "the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained in the mistaken belief their theft would benefit them." *Id.* This is because "the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff," but rather on the defendants themselves. *Id.* Therefore, "the law looks to the time at which the misappropriation

occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided he does in fact put the idea to commercial use." *Id.*

This technique frequently employs the "reasonable royalty" standard, which was originally intended to address situations where a misappropriated idea is used either to improve a defendant's manufacturing process or as part of a larger manufactured product. As opposed to an award of damages for lost profits, which requires the plaintiff to prove proximate causation and damages with reasonable certainty, an award of damages based on a reasonable royalty does not require the plaintiff to prove a specific injury. *Univ. Computing*, 504 F.2d at 536 ("This is usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove a specific injury."). In the case of *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438 (6th Cir. 1928), a patent infringement case, the defendant manufactured and sold cash registers which in part used a device developed by the plaintiff to roll paper through the machine. *Id.* at 439–40. At trial, the plaintiff was awarded the total profits made by the defendant on all sales of machines using this device. *Id.* The Sixth Circuit held this measure of damages to be inappropriate because the device was only a small component of the product sold by the defendant, and no actual apportionment of profits could be shown based on the percentage of sales of the machines that was due to the plaintiff's device. *Id.* at 441–42. The Sixth Circuit held that the proper measure of damages was a reasonable royalty on the defendant's sales and constructed an apportionment of profits based on an approximation of the actual value of the infringed device *to the defendant*. *Id.* at 442–43 (emphasis added).

The Fifth Circuit in *Universal Computing* set forth the *Egry* court's explanation of this measure of damages:

> To adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and then to determine what the license price should have been. In effect, the court assumes the existence *ab initio* of, and declares the equitable terms of, a supposititious license, and does this *nunc pro tunc*; it creates and applies retrospectively a compulsory license . . . .

*Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 537 (5th Cir. 1974) (quoting *Egry Register*, 23 F.2d at 443).

The Fifth Circuit further explained that the license price, or reasonable royalty, is "what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Univ. Computing*, 504 F.2d at 539. Occasionally this measure has been understood to mean the plaintiff's costs to develop the trade secrets, but the Fifth Circuit found this technique inadequate in *Universal Computing* because "it fails to take into account the commercial context in which the misappropriation occurred." *Id.* at 538. The Court continued to explain that "[t]his broader measure should take into consideration development costs, but as only one of a number of different factors." *Id.*

In calculating what a reasonable royalty would have been had the parties agreed to a license, courts consider: (1) the resulting and foreseeable changes in the parties' competitive posture; (2) prices paid by licensees in the past; (3) the total value of the secret to the plaintiff, including the plaintiff's development cost and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; and (5) whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternative process. *Id. See also* **Metallurgical**

*Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986) (listing the same). While "some degree of speculation is inherent in calculating a supposititious licensing agreement between two parties that has never occurred, this hypothetical construct . . . must contain some degree of certitude." *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 669 (E.D. Tex. 2002); *see also* *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 367 n.2 (5th Cir. 2010). "Naturally in some cases the damages will be subject to exact measurement, either because the parties had previously agreed on a licensing price . . . or because some industry standard provides a clear measure." *Univ. Computing*, 504 F.2d at 538–39. Where damages are uncertain, however, recovery by the plaintiff is not precluded. *Id.* at 539.

E&P companies rarely sell or purchase data of the nature and scope that Peregrine received. (Trs. 69, June 1, 2011 p.m., 85, 92–93, June 9, 2011 p.m.) This is because the value of trade secrets in the E&P context lies in the competitive advantage they give a decision maker in evaluating leasing and drilling opportunities. (Tr. 131–33, May 31, 2011 p.m.) Because of the competitive advantage TXCO held and the rapidly emerging nature of the Eagle Ford trend, TXCO kept its information confidential for its own benefit and would only have revealed its trade secret data to a partner as part of a farmout, JEA, or other joint development agreement. (Trs. 80–81, June 2, 2011 a.m., 35–36, June 2, 2011 p.m., 165–66, June 27, 2011 p.m., 125, July 6, 2011 a.m.) Because Peregrine held the same information as TXCO and was not in bankruptcy, Peregrine's misappropriation of TXCO's trade secrets gave it a superior negotiating position in relation to TXCO. Peregrine therefore gained a competitive advantage by using TXCO's trade secrets to inform its leasing decisions in Maverick and Dimmit counties. (Pl.'s Exs. 41, 93; Trs. 57–58, 100, June 1, 2011 a.m., 63–65, Aug. 9, 2011 p.m., 79, July 8, 2011 p.m.)

It is the custom and practice in the oil and gas industry to enter into a JEA in order to acquire the rights to the amount of data at issue in this case. (Tr. 105–06, May 31, 2011 p.m.) In this way, the right to use preexisting and newly developed data is purchased as part of a transaction that is mutually beneficial to both parties. This is how TXCO gained the right to use data from Encana and Anadarko, some of which was contained on the Flash Drive that Bookout sent to Peregrine, and some of which was provided by TXCO under the CA. (Trs. 72–77, May 31, 2011 p.m., 69, June 1, 2011 p.m., 48, June 10, 2011 a.m.) Such an arrangement is in the nature of granting a license to acquire and use data in exchange for paying the cost of drilling and conducting operations. (Tr. 13–14, June 6, 2011 a.m.) Accordingly, the amount of a reasonable royalty for TXCO's trade secrets can be based on the cost of a farmout or other joint exploration agreement, through which Peregrine could have properly acquired and used TXCO's trade secret information.

Under its farmout agreements, TXCO was able to earn a 50% interest in the acreage on which it drilled wells by paying for the entire cost of drilling. This situation is commonly referred to as a "carry" in the oil and gas industry because, by using its own funds to drill wells, the company farming in has "carried" its JEA partner's obligation to split the cost of drilling.[22] (Tr. 44, June 1, 2011 a.m.) Therefore, of the total amount TXCO spent on drilling under its farmout agreements, half of the funds were TXCO's cost to participate in the joint operations and acquire data, and the other half were funds TXCO spent for its own benefit to acquire acreage and produce hydrocarbons. In light of the working interest earned by TXCO, a reasonable

---

[22] Jim Sigmon explained that "[i]t's our way of paying them dollars. There's another way you could have done it, you could have paid them X dollars. The wells $5 million. I could have said, [h]ere's your $2.5 million . . . and now let's go drill a well together . . . [but] we paid the full $5 million and give them their $2.5 million worth of interest." (Tr. 44, June 1, 2011 a.m.)

royalty must take into account the costs TXCO expended under its JEAs for its own benefit. The value of a hypothetical license or "reasonable royalty" for TXCO's trade secrets, therefore, is the amount Peregrine would have spent drilling wells to earn acreage under a JEA with TXCO, discounted by the 50% working interest that Peregrine would have earned. This damage model accounts for the changes in TXCO's and Peregrine's competitive posture as a result of Peregrine's misappropriation, TXCO's development costs and the importance of its trade secrets to its operations, the nature of the use Peregrine intended for TXCO's data, and the unique circumstances under which E&P companies acquire data through joint operations. *See Univ. Computing*, 504 F.2d at 539. Although there is some degree of speculation inherent in awarding damages under this model, the evidence presented allows the calculation of a reasonable royalty with a sufficient degree of certitude. *See Alcatel*, 239 F. Supp. 2d at 669.

TXCO offered a farmout on the Encana acreage to Peregrine which Peregrine declined. If Peregrine had accepted the offer, TXCO would have allowed Peregrine to use TXCO's data and the data that TXCO acquired from both Encana and Anadarko. TXCO spent a total of $31,746,766 on its drilling operations under the Encana Farmout. (Pl.'s Ex. 738) After the application of a 50% discount due to the 50% working interest TXCO acquired, TXCO's carry under the Encana Farmout totals $15,873,383. This amount represents a reasonable royalty because it takes into account the price TXCO paid as a licensee in the past and the unique circumstances under which TXCO would have entered into a farmout agreement with Peregrine, thereby giving Peregrine the right to use the data in its operations. The "carry" provided by TXCO under its JEA with Encana was an essential component of the price it paid to develop its trade secrets, and Peregrine could have "partnered" with TXCO to acquire and use TXCO's

cumulative subsurface, production, and operations data. *See Univ. Computing*, 504 F.2d at 539. Accordingly, a reasonable royalty for Peregrine's use of TXCO's trade secrets is $15,873,383.

### XIII. *Tortious Interference with Prospective Business Relations*.

To prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish: (1) a reasonable probability the plaintiff would have entered a contractual relationship with a third party; (2) an intentional and malicious act that intervened with the formation of that relationship; (3) the defendants lacked privilege or justification to interfere; and (4) actual damage, loss, or harm resulted from the defendant's interference. *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 491 (Tex. App.—Corpus Christi 2002, no pet.).

TXCO complains that Peregrine tortiously interfered with its prospective business relations by executing oil and gas leases on the BLS Acreage. The first element requires that there was a reasonable probability that the plaintiff would have entered into a contractual relationship, but "[i]t need not be absolutely certain that the prospective contract would have been made were it not for such interference. A reasonable assurance thereof in view of all the circumstances, is generally sufficient." *Verkin v. Melroy*, 699 F.2d 729, 732 (5th Cir. 1983) (quoting *Marin v. Phillips Petroleum Co.*, 455 S.W.2d 429, 435 (Tex. Civ. App.—Houston [14th Dist.] 1970, no writ)). In the present context this element means that TXCO was required to show a reasonable probability that, absent Peregrine's lease of the BLS Acreage, TXCO would have renewed its leases on the property.

In March 2009, the BLS Owners requested that TXCO execute releases of its leases covering Section A and Section C because there was no active drilling on those lands. (Pl.'s Ex. 5; Tr. 20–30, July 1, 2011 a.m.) TXCO thereafter filed public releases of its interests in Section A and Section C. In May 2009, most of TXCO's leases on Section B expired because TXCO was

66

unable to meet its drilling requirements; however, TXCO continued operations on its Section B wells that were held by production. Despite losing its Section A, Section B, and Section C leases, TXCO continued discussions with the BLS Owners after filing bankruptcy. Additionally, TXCO obtained DIP financing to facilitate its reacquisition of Section A, Section B, and Section C, and to drill wells necessary to keep its existing leases on Section B in force. (Tr. 43–44, July 1, 2011 a.m.) Under the DIP financing, a bonus payment of $75 per acre was budgeted, but TXCO ultimately offered the BLS Owners $100 per acre. (Pl.'s Ex. 347; Tr. 44, July 1, 2011 a.m.)

Marshall Lochausen, a TXCO landman, testified that losing the BLS Acreage affected TXCO's ability to develop the Cage Acreage because "[i]t limited the directions [TXCO] could go and the length of the laterals [TXCO] could drill." (Tr. 39, July 1, 2011 a.m.) Because of the unique subdivision of mineral ownership on the Cage Ranch, it was necessary for TXCO to have leases from *all* BLS Owners so that it could effectively produce hydrocarbons through horizontal drilling. (Tr. 27, 39, 81–84, July 1, 2011 a.m.) The representatives of the BLS Owners included Stuart Stedman and Stella Sumbera for the West-Stedman group, and Bill Lloyd, Karen Scoggins, and Ed Vaughn for the Briscoe-Lloyd group. (Tr. 17, July 1, 2011 a.m.)

On June 12, 2009, Lochausen sent a proposal for a new lease with the Briscoe-Lloyd group to Karen Scoggins and Ed Vaughn that provided for a bonus of $100 per acre and 24% royalty on a two-year primary term. (Pl.'s Ex. 347) As of July 17, 2009, Scoggins, Lloyd and Vaughn had informed Lochausen that they had not gone over the proposal as a group and would get back in touch with TXCO when they were ready to discuss a new lease. (Pl.'s Ex. 183) Lochausen testified that Bill Lloyd was "really happy with what we were doing. . . . [He] was not falling over himself to sing our praises but there was no animosity at all. They would certainly take it under advisement." (Tr. 87–88, July 1, 2011 a.m.) Lochausen admitted that "they did

question our financial ability. I mean, that was a fact of life, we were in bankruptcy." (***Id.*** at 88) Lochausen thought there was a chance at obtaining a new lease on the BLS Acreage because "[n]o one had told me differently, so I had no reason to believe we still weren't negotiating." (***Id.*** at 95) Lochausen testified that TXCO would have gone up to $150 per acre. (***Id.*** at 44)

On September 1, 2009, Lochausen emailed Scoggins to request an update on TXCO's offer. (Pl.'s Ex. 185) Scoggins replied that she did not have anything new to tell him, but she had forwarded his email to the rest of the Briscoe-Lloyd group to remind them of the proposal. (***Id.***) On September 23, 2009, Lochausen sent a letter to Scoggins stating that TXCO knew the BLS Owners had some other proposals under consideration and again asked for an update on TXCO's lease proposal. (Pl.'s Ex. 187) TXCO land manager Bob Lee emailed Ed Vaughn on October 5, 2009, to ask for an update on TXCO's proposal. (Pl.'s Ex. 196) Despite TXCO's repeated inquiries, Lochausen testified that negotiations with the BLS Owners stalled between July and September and that he "was getting a little stonewalled." (Tr. 6, July 1, 2011 p.m.) On October 12, 2009, Lochausen received a call from Scoggins informing him that they had leased the BLS Acreage to another party. (Pl.'s Ex. 19; Tr. 13, July 1, 2011 p.m.) In the course of TXCO's efforts to obtain a new lease on the BLS Acreage, the BLS Owners never made a counteroffer to TXCO or invited TXCO to top the offers received from Peregrine or Joint Resources.

Several of the BLS Owners would not have entered into another oil and gas lease with TXCO. Regarding his experience with TXCO, Stuart Stedman testified:

> A.    [I]t was – the TXCO discussions, almost battle, to get information and to figure out what was going on lasted a long time, and pretty early on in that process I decided there's no way I would ever lease to TXCO. I don't really care what the Lloyds or the Briscoes or whoever. I mean . . . they were incompetent, inconsiderate. You know, it's hard to tell. I can't really speculate was it incompetence? Was it just . . . inconsideration? Were they just too busy? Whatever. They just didn't pay attention to details and to me, just from business experience, if you can't do the little things right imagine the well production

68

results. So all the way around, not only just in our relationship with . . . potential lessees, but then also translating that to the ability to extract and maximize recovery of hydrocarbons, pretty early on in that process I made the decision that I would not lease to TXCO.

Q.      Is it fair to – to paraphrase by saying that no matter what TXCO's reasons for the shortcomings that you experienced, in your mind, TXCO wasn't an operator that you wanted to do business with in the future if you could help it?

A.      That is correct.

. . . .

Q:      Is it fair to say that if – if the Lloyd group had decided to lease to either TXCO, or TXCO backed by somebody, or a combination thereof, or Newfield with the expectation that they're going to take over TXCO's assets that you're certain that your group would not have thrown in with that lot?

A.      Dead Certain.

(Tr. 107–08, 122–23, July 5, 2011 a.m.)

Similarly, Bill Lloyd testified that the Lloyd group mineral owners were reluctant to enter

into a new lease with TXCO because of the financial problems it was experiencing:

[W]e were very uncomfortable with the bankruptcy filing. We really were very dubious about being involved in a bankruptcy court and decisions. We were receiving lender liens . . . in the mail almost daily against TXCO. We were very concerned as to what was going to happen. If our leases were going to be involved in bankruptcy somehow. We weren't going to obtain the releases. Somehow they were going to be tied up. So we were extremely concerned . . . that this could affect us and so we wanted the releases done. The fact that they needed to muddle through their bankruptcy . . . was not something we were really excited to get involved in.

(*Id.* at 14–15)

Lloyd stated that the mineral owners were "leery" of entering a new leasing relationship

with TXCO based on their perception that the company was considering a sale of its assets

because the mineral owners would not know who was ultimately going to acquire the company:

Once the leases had terminated and we got the releases, people became aware of that. They approached us. And from a decision – from a business point of view,

you want to pick your dancing partner and I – I just think TXCO had a lot of factors up against them that we were concerned about moving forward.

(*Id.* at 32)

Additionally, Lloyd testified that TXCO's offer to reacquire the BLS Acreage "was inadequate. We had other parties that were offering substantially more money." (*Id.* at 26) The BLS Owners received offers from three companies: TXCO, Peregrine, and Joint Resources. (*Id.* at 27) While Joint Resources offered a higher bonus payment than Peregrine of $450 per acre, the BLS Owners ultimately chose Peregrine because they were satisfied with its offer, and were impressed with the company and its plan for "extracting hydrocarbons from the area." (*Id.* at 93) According to Lloyd, TXCO was not even the "runner up" in lease negotiations. (*Id.*) Rather, Lloyd considered Joint Resources to be the second-best "dog in the hunt" after Peregrine. (*Id.*) Between TXCO's bankruptcy, the dramatic increase of leasing activity in the Maverick Basin, the BLS Owners' discontent with TXCO, and the lack of bilateral negotiations between TXCO and the BLS Owners, there was not a reasonable probability that TXCO would have renewed its leases on the BLS Acreage. On the contrary, these circumstances lead to the conclusion that TXCO's chance of acquiring a new lease was slight. TXCO has not satisfied its burden of proof on this element, and relief on its tortious interference claim is therefore denied.

### XIV. *Breach of Contract.*

The contract at issue is the Confidentiality Agreement between TXCO and Peregrine, which TXCO claims was breached by Peregrine's use of the data that it was provided under the agreement. The CA stipulates that its terms shall be governed in accordance with the laws of the state of New York. (Pl.'s Ex. 1) The Texas Supreme Court has held that a contractual choice of law provision will be respected "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." ***In re J.D. Edwards***

70

*World Solutions Co.*, 87 S.W.3d 546, 549 (Tex. 2002) (orig. proceeding). Accordingly, New York law governs TXCO's breach of contract claim.

### A.  Elements.

Under New York law, the elements of a cause of action for breach of contract are: (1) the formation of a contract between the parties; (2) performance by the plaintiff; (3) the defendant's failure to perform; and (4) resulting damage. *E.g., Clearmont Prop., LLC v. Eisner*, 58 A.D.3d 1052, 1055 (N.Y. 3d Dept. 2009) (citation and internal quotation marks omitted). "[A] written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Courts must review the entire contract and "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (citation and internal quotation marks omitted).

The Confidentiality Agreement, dated February 26, 2009, is signed by corporate representatives from both Peregrine and TXCO. (Pl.'s Ex. 1) The CA defines Evaluation Material as "any information concerning [TXCO] (whether prepared by [TXCO], its advisors or otherwise) which is furnished to you by or on behalf of [TXCO]." (*Id.*) In exchange for receiving access to TXCO's information, Peregrine agreed that it would use Evaluation Material "solely for the purpose of evaluating a possible transaction" with TXCO. (*Id.*) The CA clarifies that:

> The term "Evaluation Material" does not include information which (i) is already in your possession, provided that such information is not known by you to be subject to another confidentiality agreement with or other obligation of secrecy to [TXCO] or another party, or (ii) becomes generally available to the public other than as a result of a disclosure by you or your directors, officers, employees, agents or advisors, or (iii) becomes available to you on a non-confidential basis from a source other than [TXCO] or its advisors, provided that such source is not

71

> known by you to be bound by a confidentiality agreement with or other obligation
> of secrecy to [TXCO] or another party.

(*Id.*)

Peregrine received subsurface, production, and operations data from TXCO at a Management Presentation during the First Meeting on March 5, 2009, during the Second Meeting on March 13, 2009, and thereafter in response to Peregrine's requests. This information clearly concerned TXCO's key business assets and was provided directly by TXCO through its employees to Peregrine. (Trs. 66, May 31, 2011 p.m., 5, June 26, 2011 a.m.) Peregrine acknowledged that, under the language of the contract, information concerning TXCO would include information on wells in which TXCO owned only a partial interest and all data obtained by TXCO through its JEA partners. (Tr. 50–51, July 11, 2011 p.m.)

Peregrine argued that the TXCO data it received falls under the exceptions to the definition of Evaluation Material because it was publicly available and the information Peregrine acquired through Jeff Bookout and Robert Patterson was received on a non-confidential basis. While some of the information Peregrine received was publicly available, it also received a substantial amount of non-public proprietary data. Further, as the Eagle Ford trend experienced rapid growth in 2009 and more information became publicly available, there was still a considerable amount of nonpublic information that Peregrine received. Additionally, Patterson and Bookout both owed duties of confidentiality to TXCO in accordance with industry custom, state laws requiring engineers to maintain the confidentiality of client information, and the employment agreement and separation agreement Bookout executed that included a continuing duty of loyalty. (Pl.'s Ex. 438; Trs. 119–21, 146, July 7, 2011 p.m., 17–20, June 14, 2011 p.m.) Moreover, Peregrine was aware the information received by Bookout and Patterson included TXCO's trade secrets. *See supra* Part XII.C. Peregrine clearly received an extensive amount of

TXCO data that was both nonpublic and subject to a duty of confidentiality, which constituted Evaluation Material. Peregrine was therefore prohibited from using the information for any purpose other than evaluating a transaction with TXCO.

Despite Peregrine's purported reliance on public information and the NuTech study, the evidence revealed that Peregrine used TXCO's confidential information in its leasing decisions. *See supra* Part XII.D. The terms of the CA clearly dictated that "the Evaluation Material will be used solely for the purpose of evaluating a possible transaction between [TXCO] and [Peregrine]." (Pl.'s Ex. 1) Although the CA did not prevent Peregrine from obtaining oil and gas leases in the Maverick Basin, its terms clearly prohibited Peregrine from using TXCO's information in the course of its operations. Peregrine used TXCO's information to lease the BLS Acreage and the Hamilton Ranch, outside of a transaction with TXCO and in violation of the terms of the CA. TXCO has satisfied the first three elements of its claim for breach of contract.

### B. *Damages*.

Under New York law, "'one who violates his contract with another is liable for all the direct and proximate damages which result from the violation.'" *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)). In *Sterling National Bank*, the Second Circuit held that "causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Id.* Under New York law, "causation in fact is established if the defendant's breach of duty was 'a 'substantial factor' in producing the damage.'" *Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.*, 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998) (quoting *Krofft Ent'mt, Inc. v. CBS Songs*, 653 F. Supp. 1530, 1534 (S.D.N.Y. 1987)). Furthermore, damages "must be

shown to flow naturally and directly from the breach." ***Liamuiga Tours v. Travel Impressions, Ltd.***, 617 F. Supp. 920, 929 (E.D.N.Y. 1985). Moreover, unlike Texas law governing the award of reasonable royalty damages in trade secret misappropriation claims,[23] New York law on damages for breach of contract requires a specific showing of injury. Damages which are "remote, indirect, speculative, or conjectural are not recoverable." ***Liamuiga Tours***, 617 F. Supp. at 929.

TXCO failed to prove that it suffered damages that were directly and proximately caused by Peregrine's breach of the CA for the same reasons that TXCO may not recover lost profits for its misappropriation of trade secrets claim. *See supra* Part XII.E.1.a–b. TXCO would have lost its leases on the BLS Acreage and been unable to renew them regardless of Peregrine's breach of the CA. There was no proof that Peregrine's breach actually caused TXCO to suffer damages, and TXCO's damage models were speculative. ***Id.*** Accordingly, TXCO has not satisfied its burden of proof on causation or damages, and recovery on its breach of contract claim is denied.

**XV.** ***Texas Theft Liability Act.***

    **A.** ***Elements.***

The Texas Theft Liability Act ("TTLA") provides a civil cause of action for damages against a party who commits theft by any method defined under the Texas Penal Code. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001–.005 (Vernon 2011). With respect to theft of trade secrets, a plaintiff may establish a claim by showing: (1) without the plaintiff's consent; (2) the defendant knowingly steals the plaintiff's trade secret, makes a copy of an article representing

---

[23] Under Texas law, recovery for a misappropriation of trade secrets claim does not require proof of a specific injury. ***Univ. Computing Co. v. Lykes-Youngstown Corp.***, 504 F.2d 518, 536 (5th Cir. 1974). Rather, TXCO's award of reasonable royalty damages for its trade secret misappropriation claim was determined by a permissible hypothetical construct that inherently requires a degree of speculation. *See supra* Part XII.E.2.

the trade secret, or communicates or transmits a trade secret; and (3) the plaintiff sustains damages as a result of the theft. *See* TEX. PENAL CODE § 31.05 (Vernon 2011) (providing the first two elements); TEX. CIV. PRAC. & REM. CODE § 134.005(a) (providing the third element).

"Steal" is defined as "[acquiring] property or services by theft," and "theft" is defined as "unlawfully [appropriating] property with intent to deprive the owner of property." TEX. PENAL CODE §§ 31.01(7), 31.03(a). "Deprive" is defined as "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." *Id.* § 31.01(2)(A). The evidence TXCO presented at trial was insufficient to establish that Peregrine's acquisition of TXCO's trade secrets was done with the intent to deprive TXCO of the information because the evidence failed to show that Peregrine intended to withhold the information from TXCO. *See id.* "Withhold" is defined as "to refrain from granting, giving, or allowing." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1439 (11th ed. 2009). Although it is clear that Peregrine used TXCO's trade secrets for its own gain without TXCO's consent, thereby depriving TXCO of some value by using its data to gain a competitive advantage, Peregrine never withheld the information from TXCO. To the contrary, TXCO maintained the possession and use of its trade secrets at all times. Without Peregrine's exclusive possession or withholding of TXCO's trade secrets, it cannot be said that Peregrine intended to deprive TXCO of the data. *See Falcone v. State*, 682 S.W.2d 418, 420 (Tex. App.—Houston [1st Dist.] 1984, no writ). Accordingly, TXCO failed to show that Peregrine "stole" TXCO's trade secrets as contemplated by the TTLA.

TXCO could have also proved its TTLA claim by showing that Peregrine made a copy of an article representing a trade secret. *See* TEX. PENAL CODE § 31.05(b)(2). "Copy" is defined as "a facsimile, replica, photograph, or other reproduction of an article . . . ." *Id.* § 31.05(a)(2).

"Article" means "any object, material, device, or substance or any copy thereof, including a writing, recording, drawing, sample, specimen, prototype, model, photograph, microorganism, blueprint, or map." *Id.* § 31.05(a)(1). The evidence showed that Peregrine made copies of articles representing TXCO's trade secrets because Peregrine reproduced writings containing TXCO's trade secrets in its internal documents on which it relied to lease the BLS Acreage. *See supra* Part XII.D. For example, Peregrine used TXCO's daily production data to evaluate decline curves for the Briscoe Catarina 1-H, Briscoe Catarina West 1-H, and the San Pedro 1-H wells. (Pl.'s Ex. 402; Tr. 84–88, July 15, 2011 p.m.) These decline curves were then incorporated into Peregrine's "Hamilton Ranch Opportunity" internal presentation, which Peregrine used to justify taking a lease on the Hamilton Ranch. (Pl.'s Ex. 398.40–43) Evidence also showed that Peregrine used TXCO's AFE cost information, lease operating expense data, and other production and operations data to run its economic analyses. (Trs. 67, July 25, 2011 a.m., 90, July 25, 2011 p.m., 135–37, Aug. 10, 2011 p.m.) Peregrine also used TXCO's subsurface data and slides taken directly from TXCO's Management Presentations to justify its acquisition of the Hamilton Ranch lease. (Pl.'s Ex. 398) Furthermore, Peregrine used TXCO's Eagle Ford cross-section by taking the data and inserting it into a cross-section with three additional well logs obtained from NuTech in order to evaluate the Eagle Ford play across the Maverick Basin. (Pl.'s Exs. 382, 383) Peregrine did not have TXCO's consent to use its trade secrets in this manner. Accordingly, TXCO has satisfied the first two elements of its TTLA claim.

**B.** *Damages*.

Under the TTLA, a person who commits theft is civilly liable for the damages resulting from the theft. Tex. Civ. Prac. & Rem. Code § 134.003(a) (Vernon 2011). A person who has sustained damages resulting from theft may recover the amount of actual damages found by the

trier of fact plus an additional amount not to exceed $1,000. *Id.* § 134.005(a). The TTLA does not further define actual damages, but Texas courts have interpreted actual damages to mean those recoverable at common law. *Beaumont v. Basham*, 205 S.W.3d 608, 619 (Tex. App.— Waco 2006, pet. denied). Under the common law theory of conversion, damages are generally the market value of the property at the time of the conversion. *Soto v. Sea-Road Int'l, Inc.*, 942 S.W.2d 67, 74 (Tex. App.—Corpus Christi 1997, writ denied). Additionally, damages may include "other losses or expenses necessary to compensate the plaintiff for all the actual losses or injuries sustained, not merely the reasonable market value of the property, as a natural and proximate result of the defendant's wrong." *Id.* Proof of damages for reasonable market value, however, must be based on a definite standard and established with a reasonable degree of certainty. *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). There can be no recovery when damages are speculative or conjectural. *Id.*

TXCO established that Peregrine made copies of its trade secrets, but TXCO is not entitled to damages under the TTLA because it failed to adequately prove the market value of its trade secrets. TXCO argued market value should be measured either by the increased value of the leases Peregrine acquired using TXCO data, or by the value of a farmout or other joint venture arrangement. In support of this position, TXCO presented evidence on the differences between the amounts paid by Peregrine to acquire its leases and the prices at which Peregrine offered to sell its leases to various parties. This measure does not provide a reliable standard for determining the market value of the copied data. First, any difference in value is speculative because there was no evidence Peregrine actually sold any of its leases. Additionally, the link

between any increase in value of Peregrine's oil and gas leases and the market value of TXCO's trade secrets is too attenuated to derive market value with reasonable certainty.

Similarly, the value of a farmout or joint venture arrangement is not a reliable indicator of a *market price* for TXCO's trade secrets.[24] TXCO's evidence on the value of a farmout consisted of its total costs of operations under its JEAs with Anadarko and Encana. This evidence fails to prove market value because data sharing is only one component of the comprehensive scheme for mutual operations encompassed by a farmout. TXCO admitted that E&P companies do not sell or purchase data of the nature and scope Peregrine received. (Trs. 69, June 1, 2011 p.m., 85, 92–93, June 9, 2011 p.m.) While a farmout may include data sharing, a company's costs under such an agreement are primarily incurred in order to acquire a working interest in an acreage position. Without a reliable basis for a market valuation of TXCO's data, any award of damages for TXCO's TTLA claim would be speculative and conjectural. Because TXCO has failed to establish actual damages for the copying of its trade secrets with reasonable certainty, relief under the TTLA is denied.

### C. *Attorney's Fees.*

The TTLA provides that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees. TEX. CIV. PRAC. & REM. CODE

---

[24] While the two concepts overlap, a reasonable royalty does not constitute an express or implied finding of a market valuation of trade secrets. A reasonable royalty is a unique measure of damages because it is the value of a hypothetical license that does not require a specific showing of injury. The cost of a JEA was one of several factors used by the Court to determine a reasonable royalty, but fails to establish a market value for TXCO's trade secrets because JEAs encompass a comprehensive scheme for development, not a market price for data itself. To the contrary, an award of damages under the TTLA requires establishing market value with reasonable certainty. Because E&P companies do not trade data outside of a JEA, a reliable indicator of market value for TXCO's trade secrets does not exist. Nevertheless, the cost of a JEA is one of several factors that may be considered in awarding a reasonable royalty because that measure of damages permits the use of a flexible approach to arrive at an inherently hypothetical license. *See supra* Part XII.E.2.

§ 134.005(b) (Vernon 2011). In *Intercontinental Group Partnership v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 655–57 (Tex. 2009), the Texas Supreme Court held that a party who did not recover damages could not be a prevailing party in a breach of contract action. That reasoning was extended to the TTLA in *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 641–42 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). In this adversary proceeding, TXCO is not a prevailing party because it has not obtained relief against Peregrine on its TTLA claim. Similarly, Peregrine has not asserted any counterclaims or recovered damages and is not a prevailing party under the TTLA. Neither TXCO nor Peregrine are entitled to attorney's fees under the TTLA.

**XVI.** *Unfair Competition by Misappropriation.*

  **A.** *Elements.*

   The elements of a claim for unfair competition by misappropriation are: (1) the creation of plaintiff's product through extensive time, labor, skill and money; (2) the defendant's use of that product in competition with plaintiff, thereby gaining a special competitive advantage in that competition (*i.e.*, a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to plaintiff. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 839 (5th Cir. 2004) (citing *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied)). Texas courts have explained that "misappropriation law is 'specially designed to protect the labor—the so-called 'sweat equity'—that goes into creating a work.'" *Dresser-Rand Co.*, 361 F.3d at 839 (quoting *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 778 (5th Cir. 1999)).

   The first element requires the expenditure of extensive time, labor, skill, and money to manufacture a product, which need not be tangible, but must provide some commercial

advantage. *See* ***U.S. Sporting Prods.***, 865 S.W.2d at 219 ("A complainant has a protectable property interest in the product of his labor, regardless of subject matter, so long as that matter confers on him a commercial advantage."). TXCO acquired its data over a number of years by conducting extensive drilling operations, which required TXCO to pay millions of dollars for the costs of drilling. TXCO clearly spent a great amount of resources, time, and money in order to compile information and climb a steep learning curve in the Maverick Basin. (Trs. 132, June 9, 2011 p.m., 111, June 1, 2011 a.m., 48, 107 June 2, 2011 p.m., 31, June 27, 2011 p.m.) Further, TXCO's collective trade secret information constituted a product under these circumstances. TXCO's compilation of subsurface, production, and operations data had more value than its isolated components, which gave it a considerable competitive advantage. (Trs. 132, June 10, 2011 p.m., 107, June 1, 2011 p.m.) A company in possession of the data could have used it as a tool to help determine the subsurface characteristics of the Maverick Basin, and to specifically determine where to lease and drill for hydrocarbons. In this sense, TXCO's trade secret data was a "product" that was created through extensive time, labor, and money.

To satisfy the second element, TXCO had to show that Peregrine used the misappropriated trade secrets in competition with TXCO, thereby gaining a competitive advantage because of the "free ride" obtained by Peregrine in acquiring the information. The Fifth Circuit has recently held that "use" of a trade secret includes "[a]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant . . . ." ***Bohnsack v. Varco, L.P.***, 668 F.3d 262, 279 (5th Cir. 2012) (citing ***Gen. Universal Sys. v. HAL, Inc.***, 500 F.3d 444, 450 n.4 (5th Cir. 2007) (interpreting Texas law)). Peregrine admitted its use of TXCO's trade secret data in its decision-making process to acquire leases in the Maverick Basin, which was TXCO's principal area of operations. *See supra* Part

80

XII.D. TXCO attempted to obtain new leases on the BLS Acreage, but ultimately lost out to Peregrine in its efforts to negotiate a lease. Several of the BLS Owners testified that they decided to lease to Peregrine because they were impressed with Peregrine's diligence and drilling plans for their property. *See supra* Part XIII. Regardless of whether TXCO would have ultimately been successful in acquiring new leases on the BLS Acreage, Peregrine's use of TXCO's trade secrets enabled it to negotiate from a position with the same collective knowledge acquired by TXCO.

In conjunction with Peregrine's superior financial position, the possession and use of TXCO's trade secrets gave Peregrine a clear advantage over TXCO that it would not have otherwise had due to Peregrine's inexperience in the Maverick Basin. Peregrine used TXCO's trade secrets in direct competition with TXCO to lease the BLS Acreage, but did not expend any time, effort, or money to develop the information. Peregrine did not pay TXCO for its use of the information, and could not have otherwise acquired the data except under a farmout or by conducting operations to acquire the information on its own. In this way, Peregrine exploited TXCO's trade secrets and was enriched at TXCO's expense. The second element of TXCO's unfair competition by misappropriation claim is satisfied.

## B. *Damages*.

The evidence presented at trial was insufficient to establish that TXCO suffered commercial damage that was proximately caused by Peregrine's use of TXCO's trade secrets in competition with TXCO. *See supra* Part XII.E.1.a–b. TXCO maintained the possession and use of its data at all times and failed to show that it would have been able to reacquire the BLS Acreage and economically produce hydrocarbons in the absence of Peregrine's conduct. Thus, Peregrine's use of TXCO's trade secrets did not cause a specific injury to TXCO. Furthermore,

81

TXCO's evidence on damages was speculative and therefore insufficient to establish TXCO's commercial damage with reasonable certainty. *See supra* Part XII.E.1.a–b.

### XVII. *Unjust Enrichment.*

"Unjust enrichment is an equitable principle holding that one who benefits unjustly should make restitution for those benefits." ***Villarreal v. Grant Geophysical, Inc.***, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied). Unjust enrichment occurs when a party has wrongfully secured or passively received a benefit which would be unconscionable to retain. *See id.* Like other equitable claims and defenses, the existence of an adequate legal remedy renders equitable claims of unjust enrichment unavailable. *See, e.g.*, ***BMG Direct Mktg., Inc. v. Peake***, 178 S.W.3d 763, 770 (Tex. 2005); *see also* ***Fortune Prod. Co. v. Conoco, Inc.***, 52 S.W.3d 671, 683–84 (Tex. 2000) (holding unjust enrichment inapplicable when parties have express contract covering subject matter of dispute). Here, TXCO has been awarded damages in its claim for trade secret misappropriation. The existence of an adequate legal remedy precludes TXCO's claim for unjust enrichment because the same conduct by Peregrine forms the basis of both claims.

### CONCLUSION

Judgment will be rendered that RTXCO recover damages measured by a reasonable royalty in the amount of $15,873,383 for misappropriation of its trade secrets. All other requested relief will be denied. A separate judgment will be rendered.